2006-NMCA-044

132 P.3d 1040

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Patrick RYAN, Defendant–Appellant.**

**No. 24,013.**

Court of Appeals of New Mexico.

Feb. 16, 2006.

Certiorari Denied, No. 29,703, April 7, 2006.

Patricia A. Madrid, Attorney General, Santa Fe, NM, Joel Jacobsen, Assistant Attorney General, Albuquerque, NM, for Appellee.

John Bigelow, Chief Public Defender, Trace L. Rabern, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

WECHSLER, Judge.

{1} A jury found Defendant guilty of twenty counts of criminal sexual penetration in the second degree in violation of NMSA 1978, § 30–9–11(D) (1995) (amended 2003), nine counts of criminal sexual contact in violation of NMSA 1978, § 30–9–12(D) (1993), one count of aggravated battery in violation of NMSA 1978, § 30–3–5(C) (1969), two counts of aggravated battery in violation of Section 30–3–5(B), three counts of kidnapping in violation of NMSA 1978, § 30–4–1 (1995) (amended 2003), and one count of attempted criminal sexual penetration in violation of NMSA 1978, § 30–28–1 (1963), and Section 30–9–11(D). Defendant raises three issues that we consider on appeal. First and foremost, Defendant challenges the admission of evidence obtained in the course of several warrantless searches of the building in which he lived and worked. We conclude that Defendant had no standing to challenge two of the searches and that police obtained valid consent from third parties prior to the other two searches. Second, Defendant argues that the State's lead investigative agent should not have been allowed to sit at counsel table after the rule of exclusion had been invoked. We disagree, and apply the exception for lead investigative agents. Finally, Defendant contends that the district court erred in admitting evidence of certain statements that he made to a physician, in violation of New Mexico's doctor-patient privilege. We conclude that the statements at issue were not privileged because they were made for the purpose of treating the Victim rather than Defendant. We affirm.

{2} Defendant also raises three arguments that we will not consider because we determine that they were not preserved in the district court. First, he contends that the district court erred in refusing to allow evidence that the searches were illegal. Second, Defendant argues that he was unfairly denied the opportunity to interview the State's medical expert prior to trial. Third, Defendant challenges the exclusion of his expert medical witness.

{3} Finally, Defendant raises two issues that we do not consider on appeal because he failed to properly support his arguments. Without explanation or citation to authority, he suggests that the jury may have been improperly influenced by the investigator's presence at counsel table and claims that the district court erred in excluding evidence of his poor health. We will not consider arguments not supported by authority. *Lee v. Lee* (*In re Adoption of Doe*), 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984).

## BACKGROUND

{4} The events at issue in this case took place over a period of several months, from the fall of 1996 through the spring of 1997. Both Defendant and Jennifer Lisignoli (formerly Cashman) (the Victim) worked as biologists for the Hornocker Wildlife Institute, studying black bears in a rural area near Reserve, New Mexico. They worked in a trailer or "bunkhouse" owned by Hornocker. Both the Victim and Defendant stayed overnight in the bunkhouse frequently, although Defendant maintained a home in Gallup throughout the charged period.

{5} In late 1996, the Victim began to experience serious medical problems. She suffered a number of symptoms, including amnesia, blurred vision, exhaustion, fevers, hallucinations, headaches, insomnia, light sensitivity, nausea, respiratory dysfunction, ringing in the ears, slurred speech, tremors, and vertigo, among other ailments. The Victim's illness persisted throughout the following months, despite periodic medical treatment. She was hospitalized on several occasions. The first such event took place on December 17, 1996, after the Victim fell unconscious. At that time, she was treated for suspected carbon monoxide poisoning. She collapsed again on March 23, 1997; a friend, Margaret Kirkeminde, found her at the bunkhouse with Defendant and called an ambulance over his objection. The Victim was briefly hospitalized and then released, on the theory that she had suffered a relapse relating to an earlier carbon monoxide poisoning event.

{6} The situation became even more critical on March 26, 1997, when the officers with the Sheriff's Department discovered the Victim lying incoherent in the back of a truck. She remarked, "We're all dead. . . . We're all dead in the trailer." The officers were aware of the apparent carbon monoxide problem at the Hornocker trailer, so they traveled to the bunkhouse to search for anyone else who might require medical assistance. They did not find anyone in the trailer.

{7} The Victim was briefly treated at the hospital in Silver City and then airlifted to Presbyterian Hospital in Albuquerque. Her condition was regarded as very serious, and there was concern that she might not survive. She remained at Presbyterian Hospital for more than two weeks, suffering a serious relapse during that time, while doctors struggled to diagnose her illness and treat it. Doctors were able to rule out carbon monoxide poisoning, but could not determine the cause of her symptoms. They suspected that some other environmental toxin, a rare disorder, or a recreational drug might be at fault.

{8} Officers Tom Ennist and Nick Smith, from the Forest Service and the Department of Fish and Game respectively, were both on friendly terms with Defendant and the Victim. Nick Smith's wife, Margaret Kirkeminde, was a close friend of the Victim and had previously worked for Hornocker. Nick Smith had a key to the bunkhouse, and Defendant had pointed out the location of a hidden key to both Nick Smith and Tom Ennist, a close neighbor. Defendant had invited both officers to use the bunkhouse whenever they liked. Around March 28, 1997, Tom Ennist went to the bunkhouse to feed Defendant's dog; Nick Smith accompanied him and looked around for toxins while he was there. The officers found no environmental toxins, but Nick Smith saw a drug vial in Defendant's room.

{9} After seeing the vial on March 28, Nick Smith became suspicious that Defendant might be the cause of the Victim's illness. Nick Smith expressed his suspicion to fellow law enforcement officers at a local café. His wife, Margaret Kirkeminde, who was frequently at the Victim's bedside, asked an Albuquerque doctor about the possibility that someone had drugged the Victim with bear sedatives. When hospital tests failed to

reveal any evidence of bear sedatives in the Victim's system, Nick Smith assumed he had been mistaken about the drugs, but remained suspicious that something odd was going on.

{10} On April 10, 1997, at around noon, an Albuquerque doctor telephoned several local officials and Margaret Kirkeminde to report that Defendant was in distress and needed assistance. Emergency services were dispatched to the Hornocker trailer, and Tom Ennist also responded. They searched for Defendant without success. Having failed to locate Defendant in the trailer, the officers began searching the surrounding area, until they received word that Defendant was being transported to the hospital in Albuquerque.

{11} Later that day, Nick Smith and Tom Ennist searched the trailer for sources of toxins. They checked the vents for carbon monoxide emissions and the cabinets for pesticides. While looking for the vents in the room in which Defendant slept, Tom Ennist saw three videotapes laying outside of a garbage bag. He noticed that the label of one of the tapes indicated that it contained home improvement footage. He believed that the tape might show whether or how the environmental toxins were being introduced. The officers took the home improvement tape and two others, labeled "XXO" and "XXX," to the Sheriff's Office for the purpose of viewing them on video equipment that was available there.

{12} The first few minutes of the home improvement videotape showed the Victim, Defendant, and Margaret Kirkeminde working on the bunkhouse. Then the angle changed, such that the image appeared from the vantage point of a floor vent in the bathroom. The footage showed the Victim getting out of the shower. At this point, the officers suspected that Defendant was involved in misdemeanor, peeping-tom-type activity.

{13} The officers contacted a Hornocker supervisor, Cecile Costello, and obtained permission to search the common areas of the bunkhouse. They returned to the bunkhouse shortly before dark. Tom Ennist climbed under the trailer and found the place the video camera had been mounted to the floor joists, below the bathroom vent.

{14} The officers next contacted the Victim in the hospital to request permission to search the trailer in its entirety. She gave them broad consent: "Search. Search everything. You guys—somebody needs to find out what's wrong with me. You guys search whatever you want." The officers returned to the bunkhouse around midnight and, after a very thorough search that began in the Victim's room, seized the remaining videotapes. When they watched these tapes, the officers saw footage of Defendant engaging in sex acts with the Victim, who appeared to be cataleptic or unconscious. Sophisticated techniques were eventually developed to test the Victim's hair, which revealed traces of several powerful animal sedatives and an anesthetic known as Ketamine that were consistent with her symptomatology. Defendant's trial and convictions followed.

## SUPPRESSION OF EVIDENCE

{15} Defendant contends that the district court erred in denying his motion to suppress the evidence obtained as a consequence of the warrantless searches of the bunkhouse. This evidence includes the videotapes containing the bathroom and the sexual assault footage, as well as evidence about bear sedatives seen in the room. Defendant asserts that he had a reasonable expectation of privacy in his bedroom, giving him standing to challenge the searches. He also maintains that no exception to the warrant requirement applies.

{16} "We review the denial of a suppression motion to determine whether the trial court correctly applied the law to the facts viewed in the manner most favorable to the prevailing party." *State v. Brennan*, 1998–NMCA–176, ¶ 10, 126 N.M. 389, 970 P.2d 161. "While we afford de novo review of the trial court's legal conclusions, we will not disturb the trial court's factual findings if they are supported by substantial evidence." *State v. Leyba*, 1997–NMCA–023, ¶ 8, 123 N.M. 159, 935 P.2d 1171. We need not limit our review to the record of the suppression hearing. *Id.* ¶ 10.

{17} Defendant moved to suppress the evidence seized in the course of the searches. The district court considered all of the issues

raised on appeal, including standing, state action, the community caretaking doctrine, exigent circumstances, and consent.

{18} The district court did not enter extensive findings of fact, focusing instead on articulating the legal bases for the denial of the motion to suppress. The district court determined that Defendant lacked standing to challenge the searches. It further concluded that both the March 26 search and the first of the challenged April 10 searches were justified by medical concerns, and thereafter, valid consent was obtained. As described above, law enforcement officers entered the bunkhouse to perform searches on six occasions: once on March 26, once on March 28, and four times on April 10, 1997. Defendant acknowledges that the March 26 search and the first search on April 10 were conducted for the valid purpose of addressing medical emergencies; accordingly, he has limited his challenge to the legality of the March 28 search and the last three searches on April 10. We discuss the application of the various legal doctrines to the evidence, viewed in the light most favorable to the State, while acknowledging all uncontradicted evidence. *See State v. Gonzales,* 1999–NMCA–027, ¶¶ 15–16, 126 N.M. 742, 975 P.2d 355.

### DEFENDANT'S PRIVACY EXPECTATION

{19} "The touchstone of search and seizure analysis is whether a person has a constitutionally recognized expectation of privacy." *State v. Ryon,* 2005–NMSC–005, ¶ 23, 137 N.M. 174, 108 P.3d 1032. A defendant's ability to challenge a search turns on two inquiries: (1) whether the defendant had an actual, subjective expectation of privacy in the premises searched; and (2) whether the defendant's subjective expectation is "one that society is prepared to recognize as reasonable." *See State v. Esguerra,* 113 N.M. 310, 313, 825 P.2d 243, 246 (Ct.App.1991); *accord Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). It is not clear whether the district court concluded that Defendant had no actual expectation of privacy or whether the district court concluded that any actual expectation of privacy that Defendant had was not reasonable. We discuss both inquiries below.

{20} Defendant testified that he had an actual, subjective expectation of privacy in the room in which he routinely slept. He characterized the room as his personal place to live, and as his residence. However, Defendant's testimony was contradicted by testimony that he knew others had used his room without his prior knowledge and when he was not present. For example, there was testimony that Nick Smith had once returned a borrowed object by leaving it in Defendant's room when he was not there. There was also testimony that a prior supervisor had spent the night in Defendant's bed, notifying him later by leaving a note. Defendant's testimony was also contradicted by his actions. *See State v. Bolton,* 111 N.M. 28, 42, 801 P.2d 98, 112 (Ct.App.1990) (relying on the defendant's lack of action to show no subjective expectation of privacy); *State v. Warsaw,* 1998–NMCA–044, ¶ 15, 125 N.M. 8, 956 P.2d 139 (relying on the defendant's actions to show a subjective expectation of privacy). Defendant admitted that he gave a visitor permission to use the Victim's room without her knowledge or prior approval. It was inconsistent for Defendant to claim that he did not expect his room to be used by others given these facts. It is the factfinder's prerogative to weigh the evidence and to judge the credibility of the witnesses. *State v. Gonzales,* 1997–NMSC–050, ¶ 18, 124 N.M. 171, 947 P.2d 128. There was sufficient evidence for the district court to have found that Defendant did not have an actual expectation of privacy.

{21} Turning to the second inquiry, concerning the objective reasonableness of Defendant's expectation of privacy, the Court is presented with an unusual scenario. The area at issue was Defendant's bedroom when he chose to stay at the bunkhouse rather than at his home in Gallup. Such spaces are generally afforded intense Fourth Amendment protection. *See generally Esguerra,* 113 N.M. at 313–14, 825 P.2d at 246–47 ("A person's dwelling receives the highest degree of protection from unreasonable intrusion by the government and a defendant's standing to assert his rights with respect to his home is well established in our [F]ourth [A]mendment jurisprudence."). However, the bed-

room was located in a trailer that was owned by Defendant's employer and used as the main base of operations for the southern portion of its bear study. The trailer was frequently unlocked, and keys were made available to a number of people, including the UPS driver, a neighbor boy, Tom Ennist, Nick Smith and his wife Margaret Kirkeminde, the current Hornocker supervisor and her partner, and a past Hornocker supervisor. Defendant made the bunkhouse available to acquaintances for unlimited purposes, including spending the night. Further, the central portion of the trailer was utilized as a common area, in which work-related activities were conducted. The bunkhouse was used by many other Hornocker employees and volunteers. With regard to Defendant's room more specifically, there was evidence that work-related equipment and supplies were stored there. The Victim testified that she felt free to come and go throughout the trailer, including in Defendant's room. Nick Smith even testified that if he needed a change of socks or pants, he would feel free to borrow some from Defendant's room. Finally, the Victim testified that she did not consider her own room in the bunkhouse to be private, that she did not consider it to be her bedroom despite the fact that she had no other residence, and that she could not exclude others when she was not present.

{22} If these facts alone are not enough to make any expectation of privacy unreasonable, circumstances in this case make it even more clear that a reasonable person would not expect privacy in any area of the bunkhouse. Early on, doctors were working under the assumption that the Victim's illness stemmed from carbon monoxide poisoning. Defendant had also claimed to suffer from carbon monoxide poisoning. By April 10, doctors no longer suspected carbon monoxide poisoning, but did include other environmental toxins in their list of possible causes. Defendant, at the Victim's bedside shortly before the April 10 search, gave a key to the Victim's father and asked him to search the bunkhouse for a possible cause. Defendant also voiced no objection when Nick Smith told him about the March 28 search for environmental toxins. Not only did Defendant know that searches for sources of the Vic-

tim's illness and his own were likely, he also actively encouraged such searches.

{23} While we agree with established precedent that a defendant's reasonable expectation of privacy in the home is usually very high, *see State v. Halpern,* 2001–NMCA–049, ¶ 14, 130 N.M. 694, 30 P.3d 383 ("The sanctity of the home is not abandoned simply by leaving a door cracked."), we cannot conclude that the district court erred in holding that Defendant had no reasonable expectation of privacy in the bunkhouse with respect to searches for environmental toxins. Even if Defendant had a subjective expectation of privacy in his bedroom, that expectation was not reasonable in light of his actions and the surrounding circumstances. Defendant did not protect his privacy rights, and in fact actively worked to undermine them. *See United States v. Torres,* 949 F.2d 606, 608 (2d Cir.1991) ("Neither possession nor ownership of property establishes a legitimate expectation of privacy unless the party vigilantly protects the right to exclude others."); *cf. United States v. Dunn,* 480 U.S. 294, 301–03, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (concluding that the defendant had no reasonable expectation of privacy in an area in part because he "did little to protect" that area). Defendant knew that the entire bunkhouse would be searched for environmental toxins and took absolutely no steps to protect his privacy. He did not have a reasonable expectation of privacy related to the March 28 search and the second April 10 search for environmental hazards in the bunkhouse.

{24} Defendant also could not have had a reasonable expectation of privacy in a videotape labeled "home improvement" laying on his floor next to a vent when he knew that the entire bunkhouse would be searched for environmental hazards. Given the link between home improvements and the introduction of environmental toxins into the home, Defendant must have known that someone searching for toxins might view the "home improvement" tape. He took no steps to protect the privacy of the tape, such as changing its label or locking it in his desk. Under the circumstances, we view this failure to act as indicative of a lack of any reasonable expectation of privacy. While two other

tapes, "XXO" and "XXX," were taken to the station to be viewed with the "home improvement" tape, Defendant fails to point to any indication in the record that these tapes were actually viewed, that they contained any evidence of wrongdoing, or that they influenced subsequent police activity.

{25} The third bunkhouse search on April 10 was somewhat different. Officers, having seen the "peeping tom" footage on the "home improvement" tape, obtained consent from a Hornocker supervisor and searched the common areas of the bunkhouse. Most notably, Tom Ennist crawled under the house to find the place the camera had been mounted under the bathroom vent. Although a search of the crawlspace of the bunkhouse might have been a necessary component to a thorough search for environmental toxins, this search was motivated by a desire to find evidence. If the evidence of under-vent videotaping had been discovered during a search for environmental hazards, we would have no difficulty in concluding that Defendant could not challenge its admission. But the officers searched more thoroughly and with more direction because they were looking for evidence of a crime. And while Defendant made the inside of the bunkhouse available to many others for unlimited use, no evidence suggests that Defendant encouraged others to examine the underside of the bunkhouse. It was neither open to public access nor readily viewable. *But cf. Bolton,* 111 N.M. at 41–42, 801 P.2d at 111–12 (holding that the defendant had no reasonable expectation of privacy in the undercarriage of his truck). As a result, Defendant did have the ability to challenge the third April 10 search.

{26} Once the officers confirmed that the video camera had been mounted under the bathroom vent, they obtained consent from the Victim and returned to the bunkhouse to search more thoroughly and to seize the rest of the videotapes. They did so to gather evidence of criminal activity by Defendant. Videotapes are containers, *see United States v. Albers,* 136 F.3d 670, 674 (9th Cir.1998), and a defendant may retain a reasonable expectation of privacy in the contents of a container despite the fact that it is in an area open to the public. *See State v. Courtney,* 102 S.W.3d 81, 85–87 (Mo.Ct.App. 2003). While Defendant abandoned any expectation of privacy he may have had with respect to the "home improvement" tape, the same cannot be said of other tapes in Defendant's room. Although Defendant did tell the Victim that she could watch his videotapes whenever she wished, no evidence was introduced that others were given similar invitations. Defendant therefore did have a reasonable expectation of privacy in the videotapes found within his room that were not clearly related to introduction of environmental hazards. Similarly, Defendant had a reasonable expectation of privacy in areas of his room that were not logical places to look for environmental toxins. Therefore, Defendant could challenge the final April 10 search, including the viewing of the videotapes.

{27} The district court properly considered the totality of all of the circumstances to determine the reasonableness of any expectation of privacy Defendant had. *See Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980) (approving review of the totality of the circumstances in determining whether a reasonable expectation of privacy existed); *cf. State v. Morales,* 2005–NMCA–027, ¶ 14, 137 N.M. 73, 107 P.3d 513 (applying review of the totality of the circumstances in determining whether an officer's suspicion was reasonable), *cert. granted,* 2005–NMCERT–002, 137 N.M. 266, 110 P.3d 74, *and cert. quashed,* 2005–NMCERT–008, 138 N.M. 330, 119 P.3d 1267. The district court's conclusion that Defendant had no standing to challenge the bunkhouse search of March 28, the second bunkhouse search of April 10, and the viewing of the "home improvement" videotape, is supported by the law and the evidence. However, because Defendant did have a reasonable expectation of privacy in other videotapes found within his room, we consider whether these tapes were admissible under an alternate theory. We also consider whether the third and fourth bunkhouse searches, which were largely for the purpose of gathering evidence, violated Defendant's constitutional rights.

## CONSENT

{28} In the absence of probable cause or a search warrant, a search will generally be deemed lawful if voluntary consent is obtained from an authorized person. *See State v. Duffy,* 1998–NMSC–014, ¶ 72, 126 N.M. 132, 967 P.2d 807. In this case, consent to search the crawlspace under the trailer was given by Cecile Costello. Consent to view the videotapes was given by the Victim when she said, "Search. Search everything. You guys—somebody needs to find out what's wrong with me. You guys search whatever you want." Defendant argues that Cecile Costello did not have authority to consent to a search of the common areas of the bunkhouse and that the Victim did not have authority to consent to a search of Defendant's room and a viewing of the videotapes. We disagree.

{29} Neither Cecile Costello nor the Victim could validly consent to the searches of the bunkhouse unless they had common authority over the specific areas that were searched " 'or other sufficient relationship to the premises.' " *State v. Madrid,* 91 N.M. 375, 378, 574 P.2d 594, 597 (Ct.App. 1978) (quoting *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *see Duffy,* 1998–NMSC–014, ¶ 74, 126 N.M. 132, 967 P.2d 807 ("It is constitutionally permissible for the police to search a person's home if they have received valid consent from a person who . . . has common authority over the premises."). In this context, common authority is defined as " 'mutual use of the property by persons generally having joint access or control for most purposes.' " *State v. Diaz,* 1996–NMCA–104, ¶ 10, 122 N.M. 384, 925 P.2d 4 (quoting *Matlock,* 415 U.S. at 171, 94 S.Ct. 988). A sufficient relationship may be established by the following: (1) a right to occupy the premises, (2) unrestricted access to the premises, and (3) storage of property on the premises. *Madrid,* 91 N.M. at 378, 574 P.2d at 597.

{30} Cecile Costello was the regional supervisor for Hornocker, and she had free access to the Hornocker bunkhouse. In light of her supervisory position and her use of and control over the bunkhouse, she certainly had common authority over the workspaces within it and the crawlspace underneath it. She limited her consent accordingly, only granting the officers clear permission to the search of the "common areas" of the bunkhouse. As a result, her consent validated subsequent searches of the common areas, including the third April 10 search of the crawlspace under the trailer. *See State v. Garcia,* 1999–NMCA–097, ¶ 9, 127 N.M. 695, 986 P.2d 491 (stating that the scope of a search is limited to the consent given, as measured by an objective reasonableness standard). The evidence found in the common areas of the trailer was the camera mount under the floor joists, by which the video camera was positioned in order to record the peeping-tom footage of the Victim in the shower. That evidence was therefore properly admitted.

{31} Unlike Cecile Costello, the Victim unequivocally granted the officers permission to search the trailer in its entirety: "Search. Search everything. You guys—somebody needs to find out what's wrong with me. You guys search whatever you want." Accordingly, her consent would supply the basis for the seizure of the videotapes from Defendant's room if she had common authority over that area or a sufficient relationship to that area. If her consent to search Defendant's room was valid, we must then determine whether the Victim had authority to consent to the officers' viewing of the tapes seized.

{32} The Victim lived and worked in the trailer. She testified that she made free use of the entire structure. She specifically stated that "there was no restriction as far as who could go in whose room or if you needed something, you had to ask for permission. Nothing like that." Defendant did not contradict her testimony. The Victim entered Defendant's room for a variety of purposes. According to Defendant's own statements, the Victim sometimes spent the night in Defendant's room. She stored her guns in Defendant's gun safe in his closet. She went into his room to borrow books or to look for office supplies. She also went into Defendant's room to gather laundry.

{33} Accordingly, the Court must determine whether the foregoing evidence was sufficient to establish the Victim's common authority over Defendant's room. In *Diaz*, a father consented to a search of the home that he shared with his adult son. *Diaz*, 1996–NMCA–104, ¶¶ 3–4, 122 N.M. 384, 925 P.2d 4. In the course of the search, the police entered the son's room and found narcotics. *Id.* ¶ 5. The search of that room was subsequently challenged on the theory that the father lacked common authority. The father testified that he had permission to enter the son's room, but he did so rarely. *Id.* ¶ 15. The Court held that while this testimony might have satisfied the joint access requirement, it did not establish mutual use. *Id.* Because the son "had far greater access and control," the Court concluded that he had a "superior privacy interest." *Id.* ¶ 16. As a result, the Court upheld the district court's determination that the father lacked common authority over the room. *Id.*

{34} *Diaz* suggests that common authority for the purpose of granting consent to search depends on a showing of a similar degree of access, control, and use of a space. *Id.* Applying this approach to the facts of this case, the extent of the Victim's access to, control over, and use of Defendant's bedroom may not have been comparable to that of Defendant. While Defendant admitted that the Victim sometimes slept in his room, no evidence has been introduced to show how frequently this cohabitation took place. Because it is the State's burden to establish consent, *State v. Flores*, 1996–NMCA–059, ¶ 26, 122 N.M. 84, 920 P.2d 1038, we decline to speculate as to whether the Victim and Defendant used Defendant's room to a similar degree. *But see State v. Cline*, 1998–NMCA–154, ¶ 13, 126 N.M. 77, 966 P.2d 785 (discussing the difference between father/son relationships and cohabitant spousal relationships for the purposes of the *Matlock* common authority test). Accordingly, the State has not established common authority over Defendant's room sufficient to authorize the Victim to give consent to search.

{35} We must next determine whether the Victim had another sufficient relationship that validated her consent. In *Madrid*, this Court held that a wife's consent to search her husband's home was valid, even though she did not live there at the time of the search and had not lived there for some time prior. *Madrid*, 91 N.M. at 377–78, 574 P.2d at 596–97. We relied on three factors: (1) she had a right to occupancy; (2) she had a key, which created an "inference . . . of unrestricted access"; and (3) she "use[d] the residence to some extent" by keeping some of her property there. *Id.* at 378, 574 P.2d at 597. *State v. Walker*, 1998–NMCA–117, 125 N.M. 603, 964 P.2d 164, similarly held valid the consent to search given by the victim in an alleged kidnaping case, despite the fact that she did not have a key or an intent to return to the residence except to retrieve her belongings. The court reasoned that her consent was valid because (1) she had cohabitated with defendant in the residence for some time prior to the alleged crime, (2) she had access to all rooms in the residence during the time she lived there, and (3) she had personal belongings in the residence. *Id.* ¶ 9.

{36} *Madrid* and *Walker* relied on three factors to determine that the consenting party had a sufficient relationship to the premises that validated the search, all of which are present in this case. First, they found consent because of a right to occupancy or an actual prior co-occupancy. In this case, the Defendant and the Victim lived in the same trailer, and, according to the Defendant, both stayed together in his bedroom at times. The Victim had a further right to access the Defendant's bedroom because her job required it. Second, *Madrid* and *Walker* relied on the unrestricted access in the consenting parties. In this case, the Victim similarly had never found her access to the Defendant's room restricted. She entered his room frequently and for a variety of purposes. Third, both cases relied on the storage of personal belongings in the relevant area. In this case, the Victim stored her guns in the Defendant's bedroom, and business materials she needed to access were also stored in that room. Nothing more is required for a finding of a relationship to premises sufficient to validate consent. The fourth and final bunkhouse search on April 10 was therefore based on valid consent.

{37} Finally, we must determine whether the Victim's consent could also validate the officers' viewing of the videotapes. *Cf. State v. Johnson,* 85 N.M. 465, 466, 513 P.2d 399, 400 (Ct.App.1973) (noting that valid consent to search of premises does not necessarily validate search of container found therein). If so, her broad consent to the search of the trailer, "You guys search whatever you want," would render the officers' viewing of the videotapes legal, and the videotapes admissible. The Victim and Defendant both used the video camera in their bear research, and the Victim sometimes entered Defendant's room to get the camera and tapes. Defendant had given the Victim explicit authority to enter his room to get videotapes to watch. The tapes were found on Defendant's floor and had not been hidden. The Victim therefore had the authority to view the tapes and to authorize others to view them. Because the Victim had a sufficient relationship to Defendant's room that allowed the officers to search it, and because she also had a sufficient relationship to the videotapes found in the room, she had the authority to give the officers valid consent to view the videotapes.

{38} We affirm the district court's admission of evidence seized in the March 28 search and the second of the April 10 searches on the ground that Defendant did not have a sufficient privacy interest to challenge those searches. Because we determine that the officers obtained valid consent prior to the third and fourth April 10 searches, we also affirm admission of evidence obtained during those searches. Defendant does not challenge the other searches.

## THE INVESTIGATIVE AGENT'S PRESENCE AT COUNSEL TABLE

{39} Defendant contends that a witness for the State, Agent Virginia Melvin, was improperly permitted to sit at counsel table as the State's lead investigator throughout the trial notwithstanding the fact that she had supervised the jury venire prior to impanelment. The district court's ruling is reviewable for abuse of discretion. *See, e.g., State v. Hernandez,* 115 N.M. 6, 18, 846 P.2d 312, 324 (1993); *State v. Chavez,* 100

N.M. 730, 732, 676 P.2d 257, 259 (Ct.App. 1983).

{40} Defendant contends that the rule of exclusion should have prevented Agent Melvin's presence at counsel table. Generally speaking, the parties have the right to invoke the rule of exclusion, thereby preventing witnesses from sitting in the courtroom throughout the trial. *See* Rule 11–615 NMRA. However, several exceptions apply. Among these is the exception for investigative agents. *See Chavez,* 100 N.M. at 732, 676 P.2d at 259; *e.g., Hernandez,* 115 N.M. at 18–19, 846 P.2d at 324–25. Below, the State clearly identified Agent Melvin as its lead investigative agent. Defendant has not challenged this characterization, either in argument to the district court or on appeal. Accordingly, the district court acted well within established jurisprudence by allowing Agent Melvin to remain in the courtroom, at counsel table, throughout the proceedings.

## STATEMENTS MADE BY DEFENDANT TO HIS PHYSICIAN

{41} Defendant contends that the district court erred in admitting evidence of certain out-of-court statements that he made to a physician. The district court ruled that Defendant's statements to physicians about the Victim's condition were not privileged; moreover, any privilege was waived when such statements were made in the presence of third parties. The New Mexico Rules of Evidence establish a limited privilege for communications between a doctor and a patient. To invoke the privilege, a claimant must establish that he or she was a patient at the time the statement was made, that the communication at issue was confidential, and that the statement was made for the purpose of diagnosing or treating the patient. *See* Rule 11–504(B) NMRA; *State v. Roper,* 1996–NMCA–073, ¶ 7, 122 N.M. 126, 921 P.2d 322. The application of Rule 11–504 and the law to the facts is reviewed de novo. *Roper,* 1996–NMCA–073, ¶ 4, 122 N.M. 126, 921 P.2d 322. The statements at issue were not made for the purpose of diagnosing or treating Defendant, but rather, for the purpose of diagnosing or treating the Victim. Consequently, the statements are

outside the scope of the privilege, and the district court's ruling was well supported.

## LIMITATIONS ON EVIDENCE OF THE LEGALITY OF THE SEARCHES

{42} Defendant asserts that the district court prevented him from presenting his key defense when it ruled that he could not develop evidence at trial that the police acted illegally throughout the course of their investigation. The admission or exclusion of evidence is within the sound discretion of the district court. *State v. Stanley*, 2001–NMSC–037, ¶ 5, 131 N.M. 368, 37 P.3d 85. Evidentiary rulings are affirmed unless they can be characterized as "clearly untenable or not justified by reason." *State v. Woodward*, 121 N.M. 1, 4, 908 P.2d 231, 234 (1995) (internal quotation marks and citation omitted).

{43} Generally, in order to preserve claimed error for review, a timely and reasonably specific objection must be made. *State v. Varela*, 1999–NMSC–045, ¶ 25, 128 N.M. 454, 993 P.2d 1280; *State v. Lucero*, 1999–NMCA–102, ¶ 23, 127 N.M. 672, 986 P.2d 468. However, Defendant indicated to the district court that he had no interest in presenting evidence challenging the legality of the searches, and he agreed that such legal issues should not be submitted to the jury for its consideration. Defendant has not preserved this issue and we will not consider it on appeal. *See State v. Mercer*, 2005–NMCA–023, ¶ 31, 137 N.M. 36, 106 P.3d 1283 (holding that where counsel specifically agreed not to question a witness about particular matters, those limitations on the presentation were not preserved for appeal); *State v. Goss*, 111 N.M. 530, 533, 807 P.2d 228, 231 (Ct.App.1991) (stating that non-jurisdictional issues will not be considered unless preserved).

## INTERVIEW OF THE STATE'S MEDICAL EXPERT

{44} Defendant asserts that he was unfairly denied the opportunity to interview the State's medical expert prior to trial. The grant or denial of discovery in a criminal case "is a matter peculiarly within the discretion of the trial court," which we review under an abuse of discretion standard. *State v. Bobbin*, 103 N.M. 375, 377, 707 P.2d 1185, 1187 (Ct.App.1985).

{45} Defendant raised the issue of his lack of opportunity to interview Dr. Fisher in the course of a pretrial conference on June 12, 2002. The district court ruled that the State was not required to arrange an interview. The matter was raised again immediately before trial. At that juncture, counsel for Defendant appears to have agreed that the extensive testimony given by Dr. Fisher in the course of the suppression hearing was adequate to allow preparation for trial. Accordingly, counsel sought an opportunity for a very brief interview immediately before Dr. Fisher was called as a witness at trial, to ask whether anything had changed since the suppression hearing. The district court granted this request. As such, any objection to the district court's ruling was not preserved. *Cf. Eldorado at Santa Fe, Inc. v. Cook*, 113 N.M. 33, 37, 822 P.2d 672, 676 (Ct.App.1991) (observing that a procedural defect was not preserved for appeal when counsel failed to object to the district court's proposed solution).

## EXCLUSION OF DEFENDANT'S MEDICAL EXPERT

{46} Lastly, Defendant challenges the exclusion of his expert medical witness, Dr. Walls. The district court ruled that Defendant failed to make the witness available to the State for an interview by a reasonable time prior to trial. When Defendant argued the issue to the district court in the course of the pretrial motions hearing on July 11, 2002, Defendant lacked information about the probable substance of Dr. Walls' testimony, and he therefore made no offer of proof. As a result, the district court's ruling is not subject to review on appeal. *See* Rule 11–103(A)(2) NMRA; *State v. Garcia*, 100 N.M. 120, 123, 666 P.2d 1267, 1270 (Ct.App.1983) (concluding that the defendant failed to make an offer of proof as required in order to preserve an issue of whether the district court properly excluded testimony).

## CONCLUSION

{47} For the foregoing reasons, we affirm Defendant's convictions.

{48} **IT IS SO ORDERED.**

WE CONCUR: MICHAEL D. BUSTAMANTE, Chief Judge and A. JOSEPH ALARID, Judge.