This decision was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of non-precedential dispositions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:   September 17, 2015**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                      **NO. S-1-SC-34832**

**WILLIAM PAGAN-RIVERA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Judge**

Robert E. Tangora, L.L.C.
Robert E. Tangora
Santa Fe, NM

for Appellant

Hector H. Balderas, Attorney General
Steven H. Johnston, Assistant Attorney General
Santa Fe, NM

for Appellee

**DECISION**

**DANIELS, Justice.**

{1}     Following a jury trial, the district court entered judgment against Defendant William Pagan-Rivera and sentenced him for the crimes of first-degree felony murder, two counts of negligently caused child abuse, shooting from a motor vehicle, shooting at a dwelling or occupied building, and tampering with the evidence. Defendant asks this Court to reverse his convictions on grounds that (1) his right to a speedy trial was violated, (2) the district court violated physician-patient privilege when it admitted a statement that he made to officers while at the hospital, (3) the district court violated the rule requiring the exclusion of witnesses from the courtroom when it allowed the lead investigative agent to remain in the courtroom throughout trial, (4) the district court erroneously denied his motion for mistrial, (5) his convictions are not supported by sufficient evidence, and (6) the district court's errors rise to reversible cumulative error.

{2}     We affirm Defendant's convictions by nonprecedential decision, applying established New Mexico precedent and rules of court. *See* Rule 12-405(B)(1), (3)

2

NMRA (stating that an appellate court may dispose of a case by nonprecedential decision where "[t]he issues presented have been previously decided by the Supreme Court or Court of Appeals" or where "[t]he issues are answered by statute or rules of court").

## I.      BACKGROUND

### A.      The Events of November 7, 2010

{3}      At trial, the State presented the testimony of Martha Colwell, Ramon Lopez, Antonio Lopez, and Dennie Stallworth, along with investigators and expert witnesses. The witnesses described the following events.

{4}      Martha Colwell is the mother of Ramon Lopez and Antonio Lopez who on November 7 2010, were ten and seventeen years old. Dwayne King, a family friend who was eighteen years old at the time, was living with them in their apartment. The apartment was on the ground floor in a complex that had two apartments on the ground floor and two apartments on top. The apartment next door had previously been rented by Eddieberto Morales, through whom Ms. Colwell, Ramon, and Antonio had met Defendant, Mr. Morales' cousin. Ms. Colwell and her sons had known Defendant for a few months, and Ramon had even spent time at Defendant's house with Defendant's children and knew how to get there from the apartment. Ms.

3

Colwell's neighbor from across the complex, Dennie Stallworth, had also met Defendant through Mr. Morales.

{5} On the night of November 7, 2010, Ms. Colwell, Ramon, Antonio, and Dwayne were at the apartment getting ready for bed when they heard someone knock at the door or ring the doorbell of their apartment. Dwayne answered the door. Ramon saw Defendant enter the apartment, press Dwayne up against the wall, and point a gun at Dwayne's throat. Antonio entered the room moments later and saw the same. Antonio heard Defendant say, "Give it to me. I need it all."; so Antonio shouted that Defendant was robbing them and that "Will got the gun in here." Antonio and Ramon saw Defendant fire the gun into the ceiling of the apartment.

{6} Ms. Colwell, who was in her bedroom in the apartment, heard the gunshot. She came out of her room and saw Defendant and Dwayne struggling over the gun in Defendant's hand. She ran back to her bedroom to get a metal baseball bat. Meanwhile, the struggle between Dwayne and Defendant moved outside the apartment. After pushing Ramon out of the way for his safety, Antonio and Dwayne "rushed" Defendant outside the apartment door.

{7} Antonio, Ramon, and Ms. Colwell testified about the details of the fight outside. In the struggle for the gun in Defendant's hands, Defendant fired two shots,

one of which was "towards" Antonio. Antonio was not hit, but the bullet went into the outside wall of the neighboring apartment. At some point, Ms. Colwell hit Defendant in the back with the metal bat, but Defendant did not react. She swung again and hit Defendant in the back of the head. Mr. Morales drove up in a white SUV, got out of the vehicle, and ran up to Defendant, pulling him up and asking Defendant what he was doing. As Mr. Morales and Defendant headed back to the vehicle, Defendant pointed the gun at Antonio but did not fire the gun. Mr. Morales got in the driver's seat, and Defendant got in the passenger seat of the vehicle. As the vehicle pulled away, shots were fired from the passenger window.

{8}     Mr. Stallworth, the neighbor, heard the sounds of the fight and went outside his apartment to see what was happening. Mr. Stallworth and Ramon testified that Defendant fired the gun in the direction of Mr. Stallworth's apartment. Mr. Stallworth saw people dispersing, including Defendant, Dwayne, and Antonio. He saw Dwayne running around a car in the parking lot and saw him collapse as he was running. Dwayne called out that he had been shot, and Ms. Colwell found Dwayne lying in the parking lot with a gunshot wound.

{9}     The police arrived seconds later, and Ramon guided them to Defendant's residence. Police surrounded Defendant's residence and saw a number of people

inside. The police directed the people in the residence to exit "in front of the residence." One or two women and two children came out of the front of the house. Shortly after the announcements were given to come out of the front, police officers saw two men leaving from a back door. The two men left the house quickly and "looked a little surprised." Police officers testified that Defendant got on the ground near, but not touching, a toy dump truck. Officers then took Defendant into custody.

{10}     Field detectives photographed Defendant's wounds, including a wound on the webbing between his thumb and forefinger and a wound to his head. Detective Andrea Ortiz and another detective interviewed Defendant after advising him of his constitutional rights and obtaining his waiver. Defendant did not testify at trial, but the video recording of that interview was played in full for the jury at trial.

{11}     According to the testimony of Detective Ortiz, Defendant told the following story in his interview. Defendant went to the apartment to purchase about $25 worth of marijuana from Ms. Colwell and Antonio. Defendant had asked his cousin Mr. Morales to drive him there. Once he was at the apartment, he claimed a "Black younger male" attempted to sell him crack cocaine, and when Defendant refused to buy cocaine the interaction turned violent. In the doorway of the apartment, the Black male and Antonio fought Defendant. Defendant was able to get back to the vehicle,

6

and he and Mr. Morales returned home. Defendant denied shooting anyone and denied that firearms were used in the confrontation. Defendant claimed that he injured both his hand and his head when he accidentally placed his hand on the Tonka truck while getting "down to the ground" in his back yard at police instruction. Defendant denied that he had been struck by a baseball bat.

{12}     The investigation found no crack cocaine on Dwayne or at the location of the shooting. Ms. Colwell, Antonio, and Ramon all testified that they saw Defendant with a revolver at the scene of the shooting, shortly before Defendant's arrest at his residence. One police officer saw a gun cleaning kit in a bedroom of Defendant's house after Defendant's arrest, but a full search of the house and back yard did not locate the revolver.

{13}     Field investigators photographed .40-caliber bullet casings and bullet fragments found at the shooting scene. An Albuquerque Police Department specialist in firearms and toolmarks testified that those casings were all fired from the same gun. A medical examiner performed an autopsy on Dwayne and testified that his cause of death was a gunshot wound to the torso and that the bullet that killed Dwayne was fired from a distance greater than two feet.

{14}     A jury found Defendant guilty of second-degree murder, first-degree felony

7

murder, kidnapping, two counts of negligently caused child abuse, attempt to commit the felony of armed robbery, shooting from a motor vehicle, aggravated assault with a deadly weapon, shooting at a dwelling, negligent use of a deadly weapon, and tampering with evidence. The district court vacated the sentences for second-degree murder, kidnapping, attempt to commit the felony of armed robbery, and aggravated assault with a deadly weapon to avoid unlawful multiple punishment, in light of the conviction and sentence for first-degree felony murder. The court also vacated the sentence for negligent use of a deadly weapon, concluding that the sentence for shooting at a dwelling addressed it. The court sentenced Defendant to life imprisonment plus eight years.

{15}     Defendant appealed his convictions pursuant to N.M. Const. Art. VI, Sec. 2 ("Appeals from a judgment of the district court imposing a sentence of . . . life imprisonment shall be taken directly to the supreme court.").

**II.     DISCUSSION**

{16}     There is no dispute that Defendant has preserved all of the issues raised for this Court's review, except as noted below in relation to whether the district court properly denied Defendant's motion for mistrial.

**A.     Defendant's Right to a Speedy Trial Was Not Violated**

8

{17}   The Sixth Amendment of the United States Constitution and Article II, Section 14 of the New Mexico Constitution guarantee a defendant the right to a speedy trial. *State v. Garza*, 2009-NMSC-038, ¶ 10, 146 N.M. 499, 212 P.3d 387. Whether a defendant's right has been violated depends on the particular circumstances of the case. *State v. Spearman*, 2012-NMSC-023, ¶ 16, 283 P.3d 272. This Court balances four factors originally articulated by the United States Supreme Court in *Barker v. Wingo*: 1) the length of the delay, 2) the reasons for the delay, 3) the defendant's assertion of his right, and 4) the actual prejudice to the defendant. *See* 407 U.S. 514, 530 (1972); *Garza*, 2009-NMSC-038, ¶ 13.

{18}   Following a hearing, the district court entered an order denying Defendant's motion to dismiss for violation of Defendant's right to a speedy trial. This Court gives deference to the factual findings of the trial court but weighs the *Barker* factors de novo. *Spearman*, 2012-NMSC-023, ¶ 19. Because Defendant does not challenge the district court's findings of fact, we weigh the factors based on the sequence of events as found by the district court. *See* 12-213(A)(4) NMRA (stating that an appellant's brief in chief "shall set forth a specific attack on any finding, or such finding shall be deemed conclusive").

**1.     The Length of the Delay Presumptively Prejudiced Defendant**

**{19}** Defendant's right to a speedy trial attached either upon his arrest on November 8, 2010, or at the time of his indictment on November 23, 2010. *See Salandre v. State*, 1991-NMSC-016, ¶ 13, 111 N.M. 422, 806 P.2d 562. In "complex" cases, the length of the delay is "presumptively prejudicial" where the time between the attachment of the right to speedy trial and the trial date that triggers a *Barker* analysis is greater than eighteen months. *See State v. Garza*, 2009-NMSC-038, ¶¶ 2, 21, 42.

**{20}** It is undisputed that this case is "complex" given that Defendant's indictment contained twenty counts, including one count of murder in the first degree, and given that, at one point during investigation, the witness list included fifty-eight witnesses, several of whom were expert witnesses. The district court, counting from the day of Defendant's arrest to the date of the final trial setting on February 24, 2014, found that the case had been pending for a total of forty months, exceeding the eighteen-month threshold for a "complex case"and necessitating further inquiry into the other *Barker* factors. Although the State does not dispute the district court's finding, a delay of presumptively prejudicial length does not necessarily violate Defendant's speedy trial right; it is "simply a triggering mechanism, requiring further inquiry into the *Barker* factors." *Garza*, 2009-NMSC-038, ¶ 21.

**2. The Defense Was Responsible for the Delays in Getting to Trial**

{21}    Courts may assign weights to the occurrences of delay in determining which party was responsible for the delay:

> The reasons for a period of the delay may either heighten or temper the prejudice to the defendant caused by the length of the delay. *Barker* identified three types of delay, indicating that different weights should be assigned to different reasons for the delay. First, *Barker* held that [a] deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. . . . Second, *Barker* distinguished intentional delay from negligent or administrative delay, and held that [a] more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. . . . Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Garza*, 2009-NMSC-038, ¶¶ 25-27 (alterations in original) (internal quotation marks and citations omitted) (discussing *Barker*, 407 U.S. at 531).

{22}    The district court found that there was no indication in the record that the State had intentionally delayed this case. That finding is not disputed on appeal. Defendant himself stipulated twice to continue the trial settings despite having notice that administrative delay due to changing judges and overcrowded dockets would cause unusual delay in bringing this case to trial. Administrative delay is weighed against the state "lightly." *Garza*, 2009-NMSC-038, ¶ 26. Delay cannot be weighed in Defendant's favor where Defendant himself sought and obtained repeated

11

postponements and continuances: in 2011, 2012, and 2013. In granting Defendant's last motion to continue, the district court noted that even by August 23, 2013, discovery was still "ongoing" and that pretrial interviews were "incomplete."

{23} The fact that discovery was incomplete at this late time was the result not of the State's actions but of the pace of the defense preparation. Despite the efforts of the State to assist in pretrial preparation, the defense caused repeated delays. The State invited defense counsel to participate in interviews of prosecution witnesses scheduled on several dates in the summer of 2011 and the Spring of 2012, but the defense failed to take advantage of those opportunities.

{24} Although we are concerned about the length of time this case took to get to trial, we must conclude that the ultimate blame lies not with the prosecution or the court but with the defense.

**3. Defendant Did Not Meaningfully Assert His Right to Speedy Trial**

{25} "[We] accord weight to the 'frequency and force' of the defendant's objections to the delay," which may be "an indication of whether a defendant was denied needed access to speedy trial over his objection." *Garza*, 2009-NMSC-038, ¶ 32 (quoting Barker, 407 U.S. at 529). Defendant claims he asserted his right to speedy trial three times. The first, in January 2011, was a routine demand with the filing of defense

counsel's entry of appearance nine weeks after Defendant's arrest and long before the defense actually announced it was ready for trial. The second assertion was a demand included in a motion to compel disclosure filed a few months later, which Defendant withdrew, again long before the defense was actually ready to go to trial. The third assertion was not a demand for speedy trial but instead a motion to dismiss for lack of speedy trial, filed on January 10, 2014, just a few months after Defendant successfully moved to vacate another trial setting in September 2013 and six weeks before the actual trial date in March 2014. None of those three claimed assertions, particularly when viewed in the context of Defendant's own attempts to avoid his own judgment day, reflect any serious interest in exercising his right to a speedy trial. *See id.* ¶ 32 (stating that a defendant's motions that are bound to slow down the proceedings are inconsistent with a defendant's assertion of his right to speedy trial).

**4. The Delay in Reaching Trial Caused Little Actual Prejudice**

{26} To obtain a dismissal of a charge or reversal of a conviction for violation of the right to speedy trial, a defendant must generally show particularized prejudice of the kind the speedy trial right is designed to protect against. *Garza*, 2009-NMSC-038, ¶ 39.

> The United States Supreme Court has identified three interests under which we analyze prejudice to the defendant: (i) to prevent

oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. As to the first two types of prejudice, [s]ome degree of oppression and anxiety is inherent for every defendant who is jailed while awaiting trial. Therefore, we weigh this factor in the defendant's favor only where the pretrial incarceration or the anxiety suffered is undue. . . . The third type of prejudice is the most serious. Again, however, it is necessary for a defendant to substantiate this type of prejudice.

*Garza*, 2009-NMSC-038, ¶¶ 35-36 (alteration in original) (internal quotation marks and citations omitted). We address Defendant's arguments that his particularized prejudice included the anxiety he experienced during his long pretrial incarceration, the loss of his job, the loss of his family home and belongings, the hardship to his family, and a vague assertion that potential defense witnesses had moved or could not be located.

{27}    We recognize that lengthy pretrial incarceration is stressful and can often result in hardships to a defendant and the defendant's family. *Garza*, 2009-NMSC-038, ¶ 35. It should be minimized wherever reasonably possible, but we have had to acknowledge that this is the type of prejudice, "'inherent for ever[y] defendant who is jailed while awaiting trial,'" that we only weigh in a defendant's favor if such prejudice or anxiety is "undue." *Id.* (alteration in original) (citation omitted). We cannot conclude that this emotional and financial anxiety is undue where the delay

14

was the result of Defendant's own motions to continue the trial setting.

{28} Most of the consequences of incarceration in this case were not caused primarily by the length of the delay between arrest and trial. Defendant lost his job immediately upon his arrest, and his family lost their home and belongings within the first month of his incarceration. Defendant's anxiety likely had been a result of the fact of his plight and bleak future prospects and not a result of the length of his incarceration because he was first treated for depression soon after his initial arrest.

{29} Where the focus is on the "most serious" potential form of prejudice, whether the delay impaired the defense, *Garza*, 2009-NMSC-038, ¶ 35, Defendant fails to establish that his defense was impaired by the length of time that passed between arrest and trial. Defendant's own investigator admitted that as early as July 2011, just eight months after Defendant's arrest, she was unable to locate any witnesses who could support Defendant's story. Even assuming any such witnesses ever existed and ever had any exculpatory testimony to offer, the absence of the witnesses was not caused by the delay. In fact, the delays that were successfully obtained by the defense increased opportunities to locate any real exculpatory witnesses. We therefore find no substance in Defendant's claim that he suffered an impairment to his defense.

{30} We conclude that Defendant has failed to show the kind of prejudice that

would require a reversal of his convictions for violation of his right to speedy trial.

**B.     Defendant's Hospital Statements to Officers Were Not Privileged**

{31}     Immediately after Defendant had been taken into custody, Officer Hernandez and Officer Webster transported Defendant to a hospital. At the hospital, Defendant, Officer Hernandez, and Officer Webster entered one of the treatment rooms. Officer Hernandez was asked to testify at trial to what Defendant said while in the treatment room. Defendant objected and argued that any statements made in the treatment room were made for the purpose of medical diagnosis and protected by the physician-patient privilege.

{32}     Outside the presence of the jury, Officer Hernandez stated that while he, Officer Webster, and Defendant were in a treatment room at the hospital, Defendant said that his injuries were the result of falling on a Tonka truck. Defendant said this repeatedly, both in the presence of medical personnel and when Defendant was alone with Officer Hernandez and Officer Webster. The district court concluded that Defendant's statements to the officers when medical personnel were absent were not privileged. The court permitted Officer Hernandez to testify in the presence of the jury only about Defendant's statements made to the officers when no medical personnel were present. Officer Hernandez accordingly testified that Defendant stated

several times that his injuries came about from having fallen on a Tonka truck and that Defendant appeared to find this amusing.

{33} Defendant argues on appeal that the district court admitted the statement in violation of Rule 11-504 NMRA. This Court reviews an application of Rule 11-504 to the facts de novo. *State v. Roper*, 1996-NMCA-073, ¶ 4, 122 N.M. 126, 921 P.2d 322; *State v. Attaway*, 1994-NMSC-011, ¶¶ 6, 10, 117 N.M. 141, 870 P.2d 103 ("If . . . the question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then . . . the question should be classified as one of law and reviewed de novo." (internal quotation marks and citation omitted)).

{34} A "patient has a privilege to refuse to disclose, or to prevent any other person from disclosing, a confidential communication made for the purpose of diagnosis or treatment of the patient's physical, mental, or emotional condition." Rule 11-504(B). The privilege only applies to communications "between the patient and the patient's physician, psychotherapist, or state or nationally licensed mental-health therapist." *Id.* A statement between a patient and a physician is confidential "if made privately and not intended for further disclosure except to other persons in furtherance of the purpose of the communication." Rule 11-504(A)(5).

17

{35} Because the district court was careful not to permit the officers to testify to any statement Defendant made to, or even in the presence of medical personnel, Rule 11-504 clearly provides no privilege that would prevent the officers from testifying about Defendant's statements. We therefore need not reach the question whether Defendant's other statements to medical personnel that he had fallen on a toy truck were really made for the purpose of diagnosis or treatment. Nor do we need to address the question whether statements to medical personnel in the presence of officers were made with expectations of privacy or whether they were instead made with the intent that the officers hear them as an alternative explanation of the wounds eyewitnesses to the shooting said had been inflicted during the struggle at the homicide scene.

{36} The district court correctly ruled that Defendant's statements made to the officers when no medical personnel were around were not privileged.

**C.     The District Court Did Not Abuse Its Discretion in Allowing Detective Ortiz to Remain in the Courtroom During Trial**

{37} The rule excluding witnesses states that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witness' testimony, or the court may do so on its own." Rule 11-615 NMRA. The purpose of the rule excluding witnesses is to give the adverse party an opportunity to expose inconsistencies in testimony and to prevent the possibility of one witness shaping testimony to that of

18

another witness. *State v. Ortiz*, 1975-NMCA-112, ¶ 33, 88 N.M. 370, 540 P.2d 850.

{38}     Defendant filed a pretrial motion in limine invoking Rule 11-615. The State had designated Detective Andrea Ortiz, who was responsible for the entirety of the investigation, as the lead investigative agent so that she could sit at counsel table to assist the prosecution. Detective Ortiz was also a witness the State intended to call at trial because she was the main officer on the case and had written the police reports. After hearing arguments on the motion, the district court allowed Detective Ortiz to stay in the courtroom but ordered her not to discuss the testimony or case with other witnesses. The court excluded all other witnesses and required that they not discuss their testimonies with each other.

{39}     Defendant challenges the district court's pretrial ruling on appeal. "The trial court has broad discretion in the application of Rule 11-615. We will not disturb the decision of the trial court absent a clear abuse of this discretion and prejudice to the complaining party." *State v. Hernandez*, 1993-NMSC-007, ¶ 36, 115 N.M. 6, 846 P.2d 312 (citation omitted).

{40}     Pursuant to Rule 11-615, a district court is not authorized to exclude a witness from hearing the testimony of others if the witness is "an officer or employee of a party that is not a natural person, after being designated as the party's representative

19

by its attorney." Rule 11-615(B). An investigative officer so "designated" and appointed as a witness by the state is such an officer. *State v. Chavez*, 1983-NMCA-120, ¶ 12, 100 N.M. 730, 676 P.2d 257 ("Allowing counsel for the State to have an investigative agent at counsel table throughout the trial even though the agent is or may be a witness is an exception to the rule of exclusion."). Where the State had clearly identified Detective Ortiz as its lead investigative officer and Defendant did not challenge Detective Ortiz's role as the lead investigative officer, the district court did not abuse its discretion in allowing Detective Ortiz, who was also a witness for the State, to remain in the courtroom throughout the proceedings. *State v. Ryan*, 2006-NMCA-044, ¶ 40, 139 N.M. 354, 132 P.3d 1040 (concluding that where the state identified an officer as its lead investigative officer and the defendant did not dispute that fact, the district court acted "well within established jurisprudence" to allow the officer, who was also a witness for the state, to remain in the courtroom throughout the trial). Additionally, Defendant has not shown how having Detective Ortiz in the courtroom prejudiced his defense. We affirm the district court's pretrial ruling allowing Detective Ortiz to remain in the courtroom.

**D.      The District Court Did Not Abuse Its Discretion in Denying Defendant's Motion for Mistrial**

{41}      Defendant asserts on appeal that he moved for mistrial based upon Officer

20

Hernandez and Detective Ortiz having remained in the courtroom "when the recording of Defendant's statement was presented." This is an inaccurate statement of the record as to when Defendant moved for mistrial. During the State's examination of Detective Ortiz, the State played a video recording for the jury that consisted of Detective Ortiz's November 8, 2010, interview of Defendant and included Defendant's statements that the Tonka truck was the cause of his injuries. Defendant did not object to the admission or presentation of the interview recording and did not move for mistrial at any time based on the presentation of the recording. The record does not reflect that any law enforcement officers were present in the courtroom at that time other than Detective Ortiz, the officer testifying. Accordingly, that issue as framed in Defendant's briefs on appeal has not been preserved. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked . . . ."). Lacking any factual development in the record, we cannot conclude that this alleged error is fundamental. *See* Rule 12-216(B)(2) (stating that the preservation requirement does not preclude the appellate court from considering questions involving "fundamental error or fundamental rights of a party").

{42}     Instead, we will construe Defendant's argument as a challenge to the district

court's denial of a motion for mistrial that Defendant actually did make at trial. Officer Hernandez was about to testify to what Defendant told him in the hospital treatment room when Defendant objected on grounds of the physician-patient privilege. The jury was asked to leave the room. During the arguments over the objection outside the presence of the jury, the prosecutor stated to the court that Detective Ortiz would later testify that Defendant told her his injury was caused by a Tonka Truck. The record does reflect that Officer Hernandez remained in the courtroom during these arguments.

{43}    Following Officer Hernandez's testimony at trial, Defendant moved for a mistrial, claiming that Rule 11-615 was violated when the prosecutor stated, in the presence of Officer Hernandez, that Detective Ortiz would later testify that Defendant told her his injury was caused by a Tonka Truck. Defendant argued that this constituted the prosecutor and the court "vouching" for the veracity of Detective Ortiz's expected testimony. The district court concluded that having Officer Hernandez present in the courtroom during argument in which future testimony of Detective Ortiz was discussed was a violation of Rule 11-615 but that no prejudice resulted from this error because Officer Hernandez had already stated in his pretrial interview that Defendant told him the injuries were caused by the Tonka truck. The

court also concluded that it had not erred in permitting Detective Ortiz to remain in the courtroom throughout trial as it had decided in its pretrial ruling because case law and Rule 11-615 states that representatives of a party, including police officers who serve as witnesses, may remain present in the courtroom throughout the trial. The court allowed Defendant to cross-examine Detective Ortiz about the fact that she has been present throughout the testimony of every other witness.

{44} This Court reviews a trial court's application of Rule 11-615 for abuse of discretion. *Hernandez*, 1993-NMSC-007, ¶ 36. As both parties agree, we review the district court's denial of Defendant's motion for mistrial made on grounds of Rule 11-615 for abuse of discretion. *See State v. Saavedra*, 1988-NMSC-100, ¶ 9, 108 N.M. 38, 766 P.2d 298 (stating that this Court's standard for reviewing a motion for mistrial affords the trial court discretion that depends on the "underlying issue"); *State v. Contreras*, 2007-NMCA-045, ¶¶ 24, 27, 141 N.M. 434, 156 P.3d 725 (reviewing a trial court's denial of the defendant's motion for mistrial for abuse of discretion where the underlying issue was evidentiary); *State v. Kijowski*, 1973-NMCA-129, ¶ 5, 85 N.M. 549, 514 P.2d 306 ("[P]ermitting a witness to testify who has violated the court's instruction not to discuss the case with other than the attorneys is within the trial court's discretion.").

23

{45} We conclude that the district court did not abuse its discretion in denying Defendant's motion for mistrial. The prosecutor's statement about Detective Ortiz's future testimony did not and could not have changed Officer Hernandez's testimony. Officer Hernandez had already stated in a pretrial interview that Defendant said his injuries were caused by the Tonka truck. The jury did not hear the prosecutor's statement. Where there is "no danger" that a witness could conform testimony to the testimony of another witness, a trial court does not abuse its discretion in allowing a witness to testify after Rule 11-615 had been invoked. *Ortiz*, 1975-NMCA-112, ¶¶ 33-34. Nor can it be said that the district court "vouched for" for Detective Ortiz's testimony. The Code of Judicial Conduct prohibits a judge from "vouch[ing]" for the character of a person in a legal proceeding unless that person is duly called as a witness. Rule 21-303 NMRA. But here all the court did was to accept a proffer from the prosecutor outside the presence of the jury regarding what testimony was expected.

{46} Defendant also argued in his reply brief for the first time on appeal that the district court erred in allowing Detective Ortiz to remain in the courtroom because Detective Ortiz "discussed the case with witnesses and lawyers for the State," prejudicing Defendant's case. Whether Detective Ortiz discussed her testimony with

other witnesses and the State's lawyers does not appear in the record, and the issue was not preserved. *See* Rule 12-216(A). To the contrary, at trial, Defense counsel clarified that "there's no suggestion that Detective Ortiz has spoken with any . . . witnesses." The record does not reflect that Defendant moved for mistrial in the district court on any grounds other than the fact that Officer Hernandez was present when the prosecutor told the court what it expected Detective Ortiz to testify about. We therefore find no merit in Defendant's argument.

**E.    Defendant's Convictions Are Supported by Substantial Evidence**

{47}    Defendant makes a generalized claim that this Court should reverse his convictions for insufficient evidence. Although he makes no references to the evidentiary record and no focused argument as to how the evidence was insufficient to establish any of the several offenses of conviction, we have independently reviewed the record and concluded that sufficient evidence supported each conviction.

{48}    Sufficiency of the evidence is reviewed on appeal by a substantial evidence standard. *State v. Treadway*, 2006-NMSC-008, ¶ 7, 139 N.M. 167, 130 P.3d 746. Evidence is substantial when it is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Rojo*, 1999-NMSC-001, ¶ 19,

25

126 N.M. 438, 971 P.2d 829. "'[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Garcia*, 1992-NMSC-048, ¶ 26, 114 N.M. 269, 274, 837 P.2d 862 (alteration in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The question before us as a reviewing Court is not whether we would have had a reasonable doubt but whether it would have been impermissibly unreasonable for a jury to have concluded otherwise." *State v. Rudolfo*, 2008-NMSC-036, ¶ 29, 144 N.M. 305, 187 P.3d 170. We must view the evidence in the "light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Chavez*, 2009-NMSC-035, ¶ 11, 146 N.M. 434, 211 P.3d 891 (internal quotation marks and citation omitted).

{49}     For each of the crimes discussed below, the State was required to show that Defendant committed these acts on or about November 7, 2010, in New Mexico. There is substantial evidence to support this element of each crime where several witnesses testified that the events occurred on that evening in Albuquerque, New Mexico.

**1.     Substantial Evidence Supports Defendant's Felony-Murder Conviction**

26

{50} For the jury to find Defendant guilty of first-degree felony murder in this case, the State had to prove the following beyond a reasonable doubt:

> 1. The defendant committed the crime of Kidnapping and/or Attempt to Commit Armed Robbery under circumstances or in a manner dangerous to human life;
> 2. The defendant caused the death of Dwayne King during the commission of Kidnapping and/or Attempt to Commit Armed Robbery; [and]
> 3. The defendant intended to kill or knew that his acts created a strong probability of death or great bodily harm.

*See* UJI 14-202 NMRA; NMSA 1978, § 30-2-1(A)(2) (1994) ("Murder in the first degree is the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused . . . in the commission of or attempt to commit any felony.").

{51} For the jury to find Defendant guilty of attempt to commit armed robbery, the State had to prove the following beyond a reasonable doubt:

> 1. The defendant intended to commit the crime of Armed Robbery; [and]
> 2. The defendant began to do an act which constituted a substantial part of the Armed Robbery but failed to commit the Armed Robbery.

*See* UJI 14-2801 NMRA; NMSA 1978, § 30-28-1 (1963) ("Attempt to commit a felony consists of an overt act in furtherance of and with intent to commit a felony and tending but failing to effect its commission."). The following are the elements of armed robbery:

27

1. The defendant took and carried away property or money from Dwayne King, or from Dwayne King's immediate control intending to permanently deprive Dwayne King of the property or money; the property had some value;

2. The defendant was armed with a handgun; [and]

3. The defendant took the property or money by force or violence or threatened force or violence.

*See* UJI 14-1621 NMRA; NMSA 1978, § 30-16-2 (1973) ("Robbery consists of the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence.").

{52} With all reasonable inferences in favor of the jury's verdict, a rational trier of fact could have found Defendant guilty of first-degree felony murder. Several witnesses testified that Defendant violently shoved Dwayne against the wall and told him, "Give it to me. I need it all." and threatened him with a handgun. Those witnesses present in the apartment thought they were being robbed. Mr. Morales drove away with Defendant before Defendant had obtained whatever he was trying to take from Dwayne. Viewing the evidence in the light most favorable to the verdict, substantial evidence supports the requirements for the predicate felony of attempted armed robbery.

{53} A rational trier of fact also could have found that Defendant caused Dwayne's death during the commission of the attempted armed robbery. Evidence was presented

28

that Dwayne's cause of death was a gunshot wound. The jury also heard evidence that Defendant had a gun throughout the incident and discharged it several times at Dwayne and others. The photographs of Defendant's injuries at the time of his arrest were admitted into evidence. These photos show that Defendant had a wound on the webbing between his thumb and forefinger. A qualified expert testified that such an injury can be the result of firing a handgun while holding it improperly. A reasonable jury could have found that Defendant knew that holding a gun to Dwayne's neck, shooting at the ceiling of the ground-floor apartment, and firing a gun in the presence and direction of others would create a strong possibility of death or great bodily harm. Substantial evidence supports the requirements of first-degree felony murder.

**2.     Substantial Evidence Supports Defendant's Child-Abuse Convictions**

{54}     For the jury to find Defendant guilty of child abuse as to either Antonio or Ramon Lopez in this case, the State had to prove the following beyond a reasonable doubt:

> 1. The defendant caused [either Antonio or Ramon Lopez] to be placed in a situation which endangered the life or health of [Antonio or Ramon Lopez];
> 2. The defendant acted with reckless disregard and without justification. To find that the defendant acted with reckless disregard, you must find that the defendant knew or should have known the defendant's conduct created a substantial and foreseeable risk, the defendant disregarded that risk and the defendant was wholly indifferent to the consequences of the

29

conduct and to the welfare and safety of [either Antonio or Ramon Lopez]; [and]

3. [Antonio or Ramon Lopez] was under the age of 18.

*See* NMSA 1978, § 30-6-1(D)(1) (2009) ("Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health.").

{55} Making all reasonable inferences in favor of the jury's verdict, a rational trier of fact could have found Defendant guilty of child abuse as to both Antonio and Ramon where evidence was presented showing that Defendant discharged a firearm multiple times in the presence of Antonio and Ramon, who were under the age of eighteen at the time. Several witnesses testified that Defendant wielded and fired a gun in the presence of both Antonio and Ramon in and at their home and in the direction of Antonio. A rational jury could find that, in shooting a gun in the presence of Antonio and Ramon and in the direction of Antonio, Defendant knew the risk of his conduct and was wholly indifferent to that risk. Substantial evidence supports the requirements of child abuse as to both Antonio and Ramon.

**3. Substantial Evidence Supports Defendant's Conviction for Shooting from a Motor Vehicle**

{56} For the jury to find Defendant guilty of shooting from a motor vehicle in this

case, the State had to prove the following beyond a reasonable doubt:

> 1. The defendant willfully shot a firearm from a motor vehicle with reckless disregard for another person; [and]
> 2. The defendant was not a law enforcement officer engaged in the lawful performance of his duty.

*See* UJI 14-342 NMRA; NMSA 1978, 30-3-8(B) (1993) ("Shooting at or from a motor vehicle consists of willfully discharging a firearm at or from a motor vehicle with reckless disregard for the person of another.").

{57} Making all reasonable inferences in favor of the jury's verdict, a rational trier of fact could have found Defendant guilty of shooting from a motor vehicle. Several witnesses testified that they saw Defendant in the passenger seat of Defendant's vehicle, and as the vehicle pulled away these witnesses heard several shots fired and saw flashes of light from the passenger window. That Defendant acted willfully is supported by the testimony showing that several shots were fired from the passenger side of the car and that Defendant was in possession of the firearm that he discharged during what the witnesses described as an armed robbery moments before he got into the passenger side of the vehicle. The jury also heard evidence that Defendant was not a law enforcement officer engaged in lawful performance of his duty in that Defendant admitted he went to the apartment to purchase marijuana. Substantial evidence supports the requirements of shooting from a motor vehicle.

31

**4.     Substantial Evidence Supports Defendant's Conviction for Shooting at an Occupied Dwelling**

{58}     For the jury to find Defendant guilty of shooting at an occupied dwelling in this case, the State had to prove the following beyond a reasonable doubt:

> 1. The defendant willfully shot a firearm at a dwelling and/or occupied building;
> 2. The defendant knew that the building was a dwelling and/or occupied; [and]
> 3. The defendant was not a law enforcement officer engaged in the lawful performance of his duty.

*See* UJI 14-340 NMRA; § 30-3-8(A) ("Shooting at a dwelling or occupied building consists of willfully discharging a firearm at a dwelling or occupied building.").

{59}     Making all reasonable inferences in favor of the jury's verdict, a rational trier of fact could have found Defendant guilty of shooting at an occupied dwelling. Witnesses testified that Defendant discharged a firearm into the ceiling of the apartment. Witnesses testified that Defendant fired in the direction of the apartment of Mr. Stallworth, who had to take cover behind a wall of his building, and that the bullet's impact dislodged dust from the wall. Witnesses also testified that Defendant fired his weapon at Antonio while outside the apartment and that the bullet from this shot impacted the wall of a separate unit in the complex. Evidence was presented that Defendant knew that these apartments he was firing at were dwellings or were

32

occupied because Defendant was familiar with the premises and admitted that he went to an apartment to purchase marijuana. This admission also gave the jury evidence that Defendant was not a law enforcement officer engaged in the lawful performance of his duty. Substantial evidence supports the requirements of shooting at an occupied dwelling.

**5.      Substantial Evidence Supports Defendant's Tampering-with-Evidence Conviction**

{60}     For the jury to find Defendant guilty of tampering with the evidence in this case, the State had to prove the following beyond a reasonable doubt:

> 1. The defendant placed and/or hid a handgun; [and]
> 2. By doing so, the defendant intended to prevent the apprehension, prosecution or conviction of himself.

*See* UJI 14-2241 NMRA; NMSA 1978, § 30-22-5(A) (2003) ("Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another.").

{61}     There was ample testimony in the record that witnesses saw Defendant with a revolver that he discharged a number of times at the homicide scene. And testimony clearly established that the police were never able to find the revolver. The combination of those facts alone is insufficient to constitute substantial evidence of

33

tampering under New Mexico law because it proves only that "evidence that must have once existed cannot now be found." *State v. Guerra*, 2012-NMSC-027, ¶ 16, 284 P.3d 1076. "Tampering with evidence is a specific intent crime, requiring sufficient evidence from which the jury can infer that the defendant acted with an intent to prevent apprehension, prosecution or conviction of any person or to throw suspicion of the commission of a crime upon another." *State v. Silva*, 2008-NMSC-051, ¶ 18, 144 N.M. 815, 192 P.3d 1192 (internal quotation marks and citation omitted).

{62} But we have emphasized that direct evidence is often unavailable to prove tampering with evidence and that "circumstantial evidence that would tend to prove a defendant acted to tamper with evidence and in so acting intended to thwart a police investigation" may support a tampering conviction. *State v. Duran*, 2006-NMSC-035, ¶ 16, 140 N.M. 94, 140 P.3d 515.

{63} Our review of the record reflects that the facts and circumstances in this case—where jury convictions and sentencing for five violent crimes including murder established Defendant's use of the revolver at the crime scene shortly before his capture—provided sufficient evidence from which a jury could reasonably conclude that Defendant disposed of the murder weapon with the intent to thwart the police

34

investigation. After shooting Dwayne, Defendant fled the scene with the revolver, firing it out the window of the car as he escaped. Within minutes, the police were at his home where they caught him trying to escape again, out the back door. In that short time, with little likelihood of or time for a stop en route for any other purpose, Defendant had gotten rid of the revolver. Not only was it not found at the scene, but it was not found on his person or anywhere in his home, where police located a gun cleaning kit. In addition to his two escape attempts, Defendant gave two verifiably false stories, the unsupported story of what had happened at the murder scene and the unsupported story of receiving his physical injuries from an encounter with a toy truck instead of from gun-related criminal encounters at the homicide scene testified to by other witnesses. Taken together, these pieces of circumstantial evidence provide sufficient support for the jury's conclusion that in the course of his quick flight from the homicide scene to his home, Defendant disposed of the revolver he had just used in the shootings with the specific purpose of preventing its use as evidence against him. Accordingly, we affirm his tampering conviction.

**F.     Cumulative Error**

{64}     "'The doctrine of cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that

35

the defendant was deprived of a fair trial.'" *State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 (citation omitted). "The doctrine of cumulative error . . . 'cannot [be] invoke[d] if the record as a whole demonstrates that [the defendant] received a fair trial.'" *Id.* (alterations in original) (citations omitted). "[W]here there is no error to accumulate, there can be no cumulative error." *State v. Saiz*, 2008-NMSC-048, ¶ 66, 144 N.M. 663, 191 P.3d 521, *abrogated on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36 n.1, 146 N.M. 357, 210 P.3d 783. There is no cumulative error in this case because Defendant has not demonstrated any trial errors.

## III.   CONCLUSION

{65}     Finding no reversible error, we affirm Defendant's convictions of first-degree felony murder, two counts of negligently caused child abuse, shooting from a motor vehicle, shooting at a dwelling or occupied building, and tampering with evidence.

{66}     **IT IS SO ORDERED.**


_____

**CHARLES W. DANIELS, Justice**

**WE CONCUR:**



_____

36

**BARBARA J. VIGIL, Chief Justice**

_____

**PETRA JIMENEZ MAES, Justice**

_____

**RICHARD C. BOSSON, Justice**

_____

**EDWARD L. CHÁVEZ, Justice**