# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: 2017-NMCA-041

Filing Date: February 2, 2017

Docket No. 34,410

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

AARON A. RAMOS,

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LINCOLN COUNTY**
**Jerry H. Ritter Jr., District Judge**

Hector H. Balderas, Attorney General
Maha Khoury, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
B. Douglas Wood III, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## OPINION

**SUTIN, Judge.**

**{1}** Defendant Aaron A. Ramos was convicted of possession of a controlled substance (methamphetamine) and was found not guilty of battery on a household member. Defendant makes two arguments on appeal: (1) that the police violated his constitutional right to be free from unreasonable searches and seizures when they entered his home without a warrant and without authority to do so, and (2) that the district court erred when it failed to grant Defendant's motion to sever the charges and hold separate trials for the battery on a household member charge and the possession of methamphetamine charge. We hold that the

police improperly entered Defendant's home without a warrant because no valid exception to the warrant requirement applied. We further hold that the evidence seized should have been suppressed, and we therefore reverse the district court's order denying Defendant's motion to suppress. Because Defendant was acquitted on the battery against a household member charge, his severance-related arguments are moot.

**BACKGROUND**

**{2}** In March 2013 Defendant was charged with battery against a household member, contrary to NMSA 1978, Section 30-3-15 (2008), and possession of drug paraphernalia,[1] contrary to NMSA 1978, Section 30-31-25.1(A) (2001), following an alleged domestic violence incident that occurred on March 7, 2013. In May 2013 he was also charged with possession of a controlled substance, contrary to NMSA 1978, Section 30-31-23(E) (2011), which similarly arose after law enforcement responded to the incident on March 7, 2013. The cases were ultimately joined in August 2013, and the State re-filed its criminal information to reflect the consolidated charges.

**{3}** Defendant filed a motion to suppress evidence found in his apartment after police responded on March 7, 2013, on the ground that "[t]he search of Defendant's apartment and subsequent seizure of alleged controlled substance was without a warrant, without exigency, and without lawful right of access to the premises." During the hearing on the motion to suppress, relevant testimony was elicited from Brittney Priddy, the alleged victim in the domestic dispute; Officer Tillman Freeman, a patrol officer with the Ruidoso Police Department; and Sergeant Mike Weaver, also with the Ruidoso Police Department.

**{4}** Ms. Priddy testified that she and Defendant had dated in the past. She also testified that she told the officers that "there was a possibility" that Defendant was the biological father of Ms. Priddy's daughter. On March 7, 2013, Ms. Priddy called the police, and the police responded to her location at a condominium complex on Carrizo Canyon in Ruidoso, New Mexico. When asked by the State where she lived on March 7, 2013, Ms. Priddy testified that she "stayed" with her dad but that she had been staying with Defendant for three to four days at his apartment, sharing the only bedroom. She was not on Defendant's lease agreement nor did she pay any rent. Defendant had asked her on March 6 to pay money for staying there.

**{5}** Ms. Priddy further testified that, when staying with Defendant, she would gain access to the apartment either with Defendant, or she would just enter when the door was unlocked. She never had her own key but sometimes Defendant would hand her his keys. Defendant did not restrict Ms. Priddy's access to any areas of the apartment when she was inside. Ms. Priddy indicated that during her stay, she had kept some of her clothes and some of her daughter's clothes at the residence. She testified that she had tried to leave the night before

---

[1]The possession of drug paraphernalia charge was dismissed prior to trial.

2

and had put her and her daughter's clothing into a box but ended up staying the night.

**{6}**     Ms. Priddy also testified that after the alleged altercation with Defendant on March 7, 2013, she ended up outside of the residence and called the police. She testified that when the police arrived Defendant was not present. Ms. Priddy, who was unable to access the residence, asked the police for help in getting her things out of the apartment. Ms. Priddy told the officers that she did not live there and was not on the lease, but had been staying there. At that point, according to her testimony, the police gained access to the residence, which was on the second story, and brought Ms. Priddy her box of clothes while she waited downstairs.

**{7}**     Sergeant Weaver received a call for service on March 7, 2013, in reference to 900 Carrizo Canyon regarding a "violent domestic." He was the first officer to arrive to the scene. Upon arrival, Sergeant Weaver made contact with Ms. Priddy and asked her if she needed to get any items out of the residence. He apparently asked her this question because she did not have anything with her and "anybody would probably need some personal clothing or toiletry-type items." Sergeant Weaver asked Ms. Priddy if anyone was inside of the residence, to which she responded, no.[2] When asked whether she had a key, Ms. Priddy said that everything was inside.[3] Sergeant Weaver testified that Ms. Priddy had said that she had been staying at the apartment, and Sergeant Weaver was aware that Ms. Priddy and Defendant had some sort of relationship based on previous incidents. Sergeant Weaver noted that the door was locked and testified that he got a key from the maintenance man at the apartment complex.

**{8}**     Sergeant Weaver did not "specifically recall" whether he or Ms. Priddy opened the door, but he believed that he did because "there was a concern that there could possibly be somebody inside the apartment." Based on that concern, Sergeant Weaver cleared the residence with Officer Freeman. After the officers cleared the residence, Ms. Priddy gathered her clothes and some children's clothes and put them in a box. According to Sergeant Weaver, it took Ms. Priddy "not even maybe thirty seconds" to gather her items. Sergeant Weaver also testified that after clearing the apartment, while he and Ms. Priddy were downstairs, he noticed a vehicle, matching the description of the vehicle Ms. Priddy had told him Defendant was in, pull into a large parking lot "across the way." Sergeant Weaver also testified that he was told that Ms. Priddy had been staying at the apartment for two days at the time of the incident.

---

[2]Although Sergeant Weaver testified that Ms. Priddy said no one was inside, he later testified that when he approached the apartment, there was concern that there could possibly be someone "or Mr. Ramos" inside of the residence. There is nothing in the record to indicate that Sergeant Weaver specifically asked whether Defendant was in the apartment.

[3]Sergeant Weaver apparently took Ms. Priddy's statement that "everything was inside" to mean that her key was inside, although Ms. Priddy never said she had a key.

3

**{9}** Officer Freeman also testified that on March 7, 2013, he received a call to 900 Carrizo Canyon regarding a "violent domestic in progress." Ms. Priddy asked Officer Freeman to assist her in obtaining her belongings. According to Officer Freeman, Ms. Priddy stated that her personal belongings and her child's belongings were in the apartment. She told Officer Freeman that she had been staying there recently. After Sergeant Weaver had obtained a key from a maintenance man, the officers entered the apartment. Before the officers entered, they asked Ms. Priddy whether anyone was in the apartment, and she stated that she did not know because she was asleep and was unsure if someone had entered prior to her waking up. The officers were also told, prior to entering, that a firearm was possibly obtained by Defendant. Upon entering the apartment, the officers cleared the residence to ensure the safety of the officers and Ms. Priddy. In clearing the residence, the officers looked in places where a person could be located or hiding. Officer Freeman was also told by Ms. Priddy that Defendant had "possibly left in a white SUV [and] possibly had a . . . firearm . . . with him."

**{10}** Officer Freeman testified that, after clearing the residence, Sergeant Weaver stood with Ms. Priddy while she obtained her and her child's property.[4] At that point, Officer Freeman saw, in plain view, what he believed to be drug paraphernalia on a coffee table in the living room of the apartment. He saw these items after clearing the apartment. He photographed the items, and the items were ultimately seized.

**{11}** Officer Freeman testified that the purpose of entering the apartment was so that Ms. Priddy could obtain her property. Officer Freeman acknowledged that Ms. Priddy had told him that drug paraphernalia could be present in the apartment but stated that the paraphernalia was not the officers' priority when entering the apartment. When asked whether he made any attempts to determine if Ms. Priddy's access to the residence was lawful, Officer Freeman stated that he learned that Ms. Priddy and Defendant had a relationship and that she had been staying at the residence recently with her child. When asked whether he had consent to enter the residence, Officer Freeman stated that he had consent from Ms. Priddy.

**{12}** After the hearing on the motion to suppress, the district court denied Defendant's motion. In its order, the court found, in relevant part:

> 1. It was reasonable for officers to believe that [Ms.] Priddy had authority to enter the residence located at 900 Carrizo Canyon, Apartment 235 to retrieve her personal items.

---

[4]The officers' testimony that Ms. Priddy collected her property from the apartment is inconsistent with Ms. Priddy's testimony that the officers entered the apartment and brought her the box of clothes while she waited downstairs. Despite the factual discrepancy, neither party highlighted the divergent testimony on appeal.

2.      The Officers['] conduct in assisting Ms. Priddy to retrieve her items was reasonable and consistent with their duties under the Family Violence Protection Act. [NMSA 1978,] §§ 40-13-1 to -12 [(1987, as amended through 2016)]; *see also State v. Almanzar*, 2014-NMSC-001, ¶¶ 19-20, [316] P.3d 183.

3.      Officer Freeman and Sergeant Weaver were acting pursuant to their duties as community caretakers. "The community caretaker exception recognizes that warrants, probable cause, and reasonable suspicion are not required when police are engaged in activities that are unrelated to crime-solving." *State v. Ryon*, 2005-NMSC-005, ¶ 24, 137 N.M. 174, 108 P.3d 1032. When Officer Freeman and Sergeant Weaver entered the residence, they were no[t] engaged in activities related to crime-solving.

4.      It was reasonable for officers to conduct a limited, protective search of the residence to determine whether any other individuals were present that could pose a danger to both the officers and Ms. Priddy.

**{13}** The day before trial, Defendant filed a motion to reconsider his motion to suppress. Defendant argued that the State failed to prove actual common authority and that apparent authority was insufficient. The court denied the motion to reconsider.

**DISCUSSION**

**A.      Standard of Review**

**{14}** We quote the standard of review in its entirety from *State v. Hernandez*, 2016-NMCA-008, ¶ 10, 364 P.3d 313, *cert. denied*, 2015-NMCERT-012, 370 P.3d 472.

When we review an appeal from a determination on a motion to suppress in a criminal case, we look at the totality of circumstances. We view the facts in a light most favorable to the prevailing party. At the same time, if the district court makes findings of fact, and if any finding is attacked for lack of substantial evidence, we will review the finding under a substantial evidence standard of review. If the finding is supported by substantial evidence, we will defer to the court's finding. Once the operative facts are ascertained, we review the constitutional reasonableness of the actions of law enforcement. A constitutional reasonableness analysis engages a process of evaluating both fact and law and is appropriately labeled a mixed question of fact and law. Despite the fact that our review requires determinations of what the operative facts are, because the process involves evaluative judgments in regard to reasonableness, we review the district court's determination de novo.

(Citations omitted.)

5

**{15}** The United States and New Mexico Constitutions prohibit unreasonable searches and seizures. U.S. Const. amend. IV; N.M. Const. art. II, § 10. "The touchstone of search and seizure analysis is whether a person has a constitutionally recognized expectation of privacy." *State v. Ryan*, 2006-NMCA-044, ¶ 19, 139 N.M. 354, 132 P.3d 1040 (internal quotation marks and citation omitted). "Among the areas afforded the greatest protection by these constitutional provisions is a person's home." *State v. Monteleone*, 2005-NMCA-129, ¶ 9, 138 N.M. 544, 123 P.3d 777. Therefore, a warrantless entry and search of a home are "presumptively unreasonable, subject only to a few specific, narrowly defined exceptions." *Ryon*, 2005-NMSC-005, ¶ 23; *Monteleone*, 2005-NMCA-129, ¶ 10 ("[A]bsent an exception to the warrant requirement, the officers' entry into [the d]efendant's apartment was a violation of his constitutional rights under both the United States and New Mexico Constitutions."); *State v. Diaz*, 1996-NMCA-104, ¶ 8, 122 N.M. 384, 925 P.2d 4 ("A search and seizure conducted without a warrant is unreasonable unless it is shown to fall within one of the exceptions to the warrant requirement."). "The [prosecution] has a heavy burden when it seeks to sustain a warrantless search." *Diaz*, 1996-NMCA-104, ¶ 8.

**{16}** Defendant argues that the consent exception to the warrant requirement does not apply because Ms. Priddy did not have the requisite authority to consent to entry and search of the apartment. The State disagrees, arguing that Ms. Priddy did have the authority to consent. According to Defendant, neither the Family Violence Protection Act (FVPA) nor the community caretaker doctrine permits a warrantless entry in this case. Defendant also argues that a protective sweep was not justified. The State argues that the entry and search were reasonable under the FVPA and under the protective sweep rule, and thus a warrant was not required. We address the possible application of exceptions to the warrant requirement articulated by the parties.

**B.    Consent**

**{17}** "A valid consensual search has been acknowledged as an exception to the warrant requirement." *Id.* ¶ 9. For consent to be valid, the party giving consent must have actual authority to do so and not merely apparent authority. *State v. Wright*, 1995-NMCA-016, ¶¶ 18-20, 119 N.M. 559, 893 P.2d 455 (holding that, under the New Mexico Constitution, the relevant inquiry is not whether officers reasonably believed that authority to consent to enter existed, but rather whether the consenting party actually had authority to consent). Our appellate courts have recognized that a third party can validly consent to a search of an apartment, however, that individual must have "common authority over the premises." *State v. Walker*, 1998-NMCA-117, ¶ 8, 125 N.M. 603, 964 P.2d 164; *see Diaz*, 1996-NMCA-104, ¶ 9. "[C]ommon authority refers to the mutual use of the property by persons generally having joint access or control of the property for most purposes." *Walker*, 1998-NMCA-117, ¶ 8. "A sufficient relationship may be established by the following: (1) a right to occupy the premises, (2) unrestricted access to the premises, and (3) storage of property on the premises." *Ryan*, 2006-NMCA-044, ¶ 29. The cases primarily relied upon by the parties, *Wright*, 1995-NMCA-016, *Diaz*, 1996-NMCA-104, and *Walker*, 1998-NMCA-117, are instructive.

6

**{18}** In *Wright*, two police officers approached a residence after receiving a tip that illegal drugs had been delivered to the residence and were being divided up for sale. 1995-NMCA-016, ¶ 3. When the two officers neared the front door, but before they had an opportunity to knock, a woman opened the door and said, "Hi." *Id.* At the time, neither officer knew who owned the residence but they asked the woman if they could come inside and talk. *Id.* The woman gave no verbal response but opened the door wider and stepped back inside the residence. *Id.* Once inside, one of the officers indicated that he became concerned about his safety because there were several vehicles outside of the residence, and yet, the only person they had encountered was the woman who answered the door. *Id.* ¶ 4. The woman was asked if anyone else was in the residence, to which she responded that only she and her children were in the residence. *Id.* After the woman showed the officers that the children were asleep in a bedroom, one of the officers noticed a light coming from under a door of a different bedroom and asked if anyone was in that room. *Id.* The woman said she did not think so. *Id.* When asked if he could look in the room, the woman responded, " 'Oh, it's not my place, but go ahead.' " *Id.* When one of the officers "started to open the door . . . it was immediately closed from inside." *Id.* The officers reopened the door and discovered the defendant, her boyfriend, and what appeared to be drug paraphernalia. *Id.* ¶¶ 1, 4-5. The defendant and her boyfriend were placed under arrest, and cocaine was found on the defendant. *Id.* ¶ 5. The officers also found paraphernalia in the boyfriend's van that was parked outside of the residence. *Id.*

**{19}** The prosecution argued in *Wright* that although the woman who answered the door did not have actual authority to grant consent to the officers' warrantless entry and search, apparent authority was sufficient. *Id.* ¶ 16. This Court disagreed and held that reliance on the officers' subjective belief that the woman had apparent authority to give consent ran counter to the New Mexico Constitution. *Id.* ¶ 19. The Court therefore held that "it was unreasonable for the officers . . . to rely on the consent of [the woman] for the search of the closed bedroom occupied by [the defendant]" and concluded that "where the [prosecution] relies upon consent to justify a warrantless search of a residence, there is no 'apparent authority' exception under Article II, Section 10 of the New Mexico Constitution." *Id.* ¶ 20.

**{20}** In *Diaz*, this Court considered whether a homeowner-father could consent to the search of his adult son's bedroom. 1996-NMCA-104, ¶¶ 1, 4. In *Diaz*, law enforcement approached the father's residence after receiving a tip from a confidential informant that there was marijuana at the residence. *Id.* ¶ 2. Upon their arrival, the agents met the defendant-son in front of the father's residence and explained that they intended to secure the premises until a search warrant could be obtained. *Id.* ¶¶ 2-3. The defendant waited outside of the residence while the agents spoke with the father inside. *Id.* ¶ 3. The father apparently signed a consent to search form, and the agents proceeded to search the residence without a warrant. *Id.* ¶¶ 4-5. The father told the agents that he lived in the residence with his two sons: the defendant, who was twenty-nine, and another son who periodically stayed there. *Id.* ¶ 4. The father stated that he owned the residence, paid all the bills, and the sons did not pay rent. *Id.* Based on the father's consent, the agents searched the defendant's bedroom that did not have a door but which had a blanket hanging from the top of the door

7

frame. *Id.* ¶ 5. The agents ultimately found marijuana. *Id.* At no time did the agents ask the defendant for consent to search his bedroom, despite the fact that the defendant was waiting in the front yard. *Id.* ¶ 4.

**{21}** The *Diaz* Court ultimately held that the district court was correct to suppress evidence discovered during the warrantless search because the prosecution failed to show that the father "had both joint access for most purposes and mutual use of [the d]efendant's room." *Id.* ¶¶ 1, 15. The Court held that the defendant "had far greater access and control and a superior privacy interest" in the bedroom. *Id.* ¶ 16. The Court also relied upon *Wright*'s rejection of the apparent-authority standard and held that the prosecution's argument that the agents had "no reason to doubt" the father's authority was insufficient because "under Article II, Section 10 of the New Mexico Constitution, the [prosecution] was required to show the actual authority of [the father] for his third-party consent to be valid." *Diaz*, 1996-NMCA-104, ¶¶ 17-18.

**{22}** In *Walker*, this Court considered whether an alleged victim had common authority to provide consent to search the apartment she shared with the defendant. 1998-NMCA-117, ¶¶ 1-2, 8. In *Walker*, the alleged victim had been living with the defendant for approximately six years. *Id.* ¶ 2. With the exception of about one month, a year prior to the events in question, the victim had been living for approximately one and one-half years at the specific apartment that was ultimately searched. *Id.* The victim ate there, slept there, kept all of her personal belongings there, and had complete access to the apartment. *Id.* At one time she had a key to the apartment, but had lost it. *Id.* According to the victim, "during the latter period of her cohabitation with [the d]efendant, . . . he physically assaulted her and he prevented her from freely leaving the apartment." *Id.* ¶ 3. At some point, she was able to escape and rode her bicycle to the hospital. *Id.* ¶ 4. At the hospital, security personnel contacted the police, and the victim ultimately returned to the apartment with the police. *Id.* At that time, the victim signed a consent form authorizing the police officers to search the apartment. *Id.*

**{23}** In holding that the victim had common authority over the apartment, this Court noted that the victim "had lived there for approximately one and one-half years, her personal belongings were in various locations throughout the apartment, and she had access to all rooms in the apartment." *Id.* ¶ 9. The Court held that neither the fact that the victim did not have a key at the time she gave consent, nor the fact that she ultimately fled the apartment, divested her of common authority over the apartment. *Id.* ¶¶ 1, 10, 13. Because the victim "possessed the requisite relationship to the apartment to allow her to consent to its search[,]" this Court reversed the trial court's order of suppression. *Id.* ¶¶ 13, 15.

**{24}** Defendant argues that the district court erred in denying his motion to suppress because Ms. Priddy did not possess actual common authority to consent to an entry and search of Defendant's apartment. Defendant argues that Ms. Priddy did not have common authority because he did not give her unrestricted access to his apartment, and she was simply a houseguest for two to four days. Defendant notes that Ms. Priddy did not have her own key to the apartment and highlights testimony from Ms. Priddy that she did not live at

Defendant's apartment, but rather had only been staying there for a few days. He also highlights that, at the suppression hearing, Ms. Priddy could not remember Defendant's address. Defendant compares and analogizes this case to *Wright*, arguing that his reasonable expectation of privacy was intruded upon when the officers acted on apparent authority and not actual authority. Defendant also argues that, as in *Diaz*, the evidence should be suppressed because Defendant had a superior privacy interest in his apartment. Defendant contrasts the facts in this case to those in *Walker*, arguing that Ms. Priddy was staying at the apartment for a significantly shorter period than the victim in *Walker*. He also argues that, unlike the victim in *Walker*, who had possessions throughout the apartment, Ms. Priddy had all of her items stored in a box in the hallway.

**{25}**    The State responds that Ms. Priddy had common authority and a sufficient relationship to the apartment, such that she was able to consent to the officers' entry. The State argues that Ms. Priddy had unrestricted access to all areas of the apartment, that she and Defendant shared a key and bedroom, and that Ms. Priddy's daughter, of whom Defendant was possibly the father, lived with them part of the time when they were at the apartment. The State also argues that Ms. Priddy kept essential belongings in the apartment for herself and her daughter. The State attempts to contrast the facts in this case to the facts in *Diaz* by arguing that the son in *Diaz* had a superior privacy interest, while Defendant in this case had no such interest. The State also compares the present case to *Walker* and argues that, as in *Walker*, Defendant could have no reasonable expectation that Ms. Priddy would not return accompanied by the police or to retrieve her belongings. Finally, the State points to language in *Wright* that "strongly suggested that 'five to ten minutes' in a bedroom [was] sufficient for a co-occupant to consent to a search."

**{26}**    We agree with Defendant that, under our case law, Ms. Priddy did not have actual common authority over the apartment. Ms. Priddy had been staying at the apartment for two to four days, unlike the alleged victim in *Walker* who had been living at the apartment for one and one-half years. Unlike the alleged victim in *Walker*, who apparently had a key but lost it, Ms. Priddy testified that she never had a key and that she entered only when Defendant let her in, when Defendant gave her his key, or when the door was unlocked. Ms. Priddy testified that she told the officers that she was staying at the apartment but that she did not live there. Although Ms. Priddy was permitted to move freely about the one-bedroom apartment when she was in the apartment and kept some clothing at the apartment during the few days that she stayed there, those facts are insufficient on their own and in light of the other facts in this case to establish common authority. This case is more comparable to *Diaz*, where this Court held that the consenting party did not have the requisite authority to consent because Defendant had "far greater access and control and a superior privacy interest" in the apartment. 1996-NMCA-104, ¶ 16.

**{27}**    We agree with Defendant that the district court's finding that "[i]t was reasonable for officers to believe that [Ms.] Priddy had authority to enter [the apartment]" signifies or indicates apparent authority, which does not fall within a recognized exception to the warrant requirement in New Mexico. This Court in *Wright* specifically rejected apparent authority

as the standard, where the prosecution argued that evidence should not be suppressed because "the officers reasonably believed that [the individual giving consent] possessed common authority over the premises." 1995-NMCA-016, ¶¶ 17, 19; *see also Diaz*, 1996-NMCA-104, ¶ 17 (restating the holding in *Wright* that "when the police are relying upon the consent of a third party to conduct a warrantless search of another's premises, the third party must have actual, not apparent, authority to grant that consent"). The district court in this case did not determine that Ms. Priddy had actual authority to consent to the entry and search. Under *Wright*, the reasonableness of the officers' belief that Ms. Priddy had authority to consent was insufficient and cannot form a proper basis for warrantless entry and search because, as a matter of law, "where the [prosecution] relies upon consent to justify a warrantless search of a residence, there is no 'apparent authority' exception under Article II, Section 10 of the New Mexico Constitution." *Wright*, 1995-NMCA-016, ¶ 20.

## C.  Protective Sweep Rule, Community Caretaker Doctrine, and the FVPA

**{28}**  Before getting into the parties' arguments and the relevant law as to the remaining exceptions, we begin by noting that the State's argument as to which exception (or combination of exceptions) to the warrant requirement applies is unclear. When arguing before the district court, it appears that the State intended to assert that the warrantless search was valid because the community caretaker exception applied, and the FVPA somehow tapped into that exception. However, on appeal, the State seems to suggest that the FVPA creates a new exception to the warrant requirement. Additionally, the State seems to contend on appeal that the warrantless entry was acceptable because it was part of a protective sweep that was properly conducted given that the officers were acting in a community caretaker capacity and/or pursuant to the FVPA.

### 1.  Protective Sweep Rule

**{29}**  In New Mexico, under limited circumstances, a warrantless search, and arguably entry, may be permissible under the protective sweep rule. *See State v. Valdez*, 1990-NMCA-134, ¶ 8, 111 N.M. 438, 806 P.2d 578 (indicating that the United States Supreme Court recognized the "protective sweep rule" as an exception to the warrant requirement and stating that the rule is recognized in New Mexico); *see also State v. Jacobs*, 2000-NMSC-026, ¶¶ 33, 36-38, 129 N.M. 448, 10 P.3d 127 (upholding a warrantless entry into and search of the defendant's home as part of a protective sweep). A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." *State v. Trudelle*, 2007-NMCA-066, ¶ 21, 142 N.M. 18, 162 P.3d 173 (internal quotation marks and citation omitted). "A protective sweep may be undertaken if the searching officers possess a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrants the officer in believing that the area swept harbored an individual posing a danger to the officer or others. However, a protective sweep is only allowed incident to a lawful arrest." *Id.* (alterations, emphasis, internal quotation marks, and citations omitted); *Valdez*, 1990-NMCA-134, ¶ 9.

10

**{30}** Defendant argues that a protective sweep was not justified in this case because there was no reasonable belief of a danger in the apartment and because the officers were not acting pursuant to an arrest. He further argues that the officers knew that Defendant had left the apartment and argues that relying on some highly remote possibility that someone may have come into the apartment while Ms. Priddy was napping was unreasonable.

**{31}** The State responds that a protective sweep of the premises was reasonable because the officers "had no way of knowing who was in the [apartment] or what weapons might be there[,]" relying on *Jacobs*, 2000-NMSC-026, ¶ 38. The State contends that the officers were told that someone may have entered the residence while Ms. Priddy was asleep and that Defendant had purchased a firearm. Thus, the State concludes, the officers reasonably believed that a security sweep of the premises was required for their and Ms. Priddy's safety.

**{32}** Here, there was no valid protective sweep because the sweep was not done incident to a lawful arrest. No one was arrested at the scene of the alleged domestic violence incident. Also, the officers did not articulate facts that would justify a protective sweep. Ms. Priddy's response that she could not be sure that someone had not entered the apartment while she was sleeping did not constitute specific and articulable facts that reasonably warranted the officers' belief that the apartment harbored an individual posing a danger to the officers or to Ms. Priddy. *See Trudelle*, 2007-NMCA-066, ¶ 21. Although Sergeant Weaver testified that there was concern that "somebody" or Defendant could be in the apartment, that statement was contradicted by Ms. Priddy, who testified that Defendant was not at the apartment and had left by the time the officers arrived, as well as by Officer Freeman, who testified that Ms. Priddy said Defendant had "possibly left in a white SUV[.]" To allow a sweep on the facts as argued by the State in this case would inappropriately expand the protective sweep rule. Defendant, having left the scene, and potentially having possession of a firearm, did not reasonably support the officers' belief that the apartment harbored an individual posing a danger.

## 2.    The FVPA and Community Caretaker Doctrine

**{33}** Defendant next argues that the FVPA did not allow the officers to enter his residence without a warrant. He argues that the officers did not determine that the clothing Ms. Priddy sought was necessary for her immediate needs as required by the FVPA. *See* § 40-13-7(B)(3). He also argues that, under the FVPA, the officers were obligated to determine whether Ms. Priddy had lawful authority to enter the apartment in order to assist her in retrieving items from inside. Finally, Defendant argues that the district court's reliance on the community caretaker exception was in error because law enforcement is only permitted to enter a person's residence without consent or a warrant if there is a strong sense of emergency that requires the immediate need for assistance for the protection of life or property.

**{34}** The State responds by relying on the plain language of the FVPA, which places an affirmative duty on law enforcement to assist and protect victims of domestic violence. It

11

argues that leaving Ms. Priddy to "fend for herself" outside of the apartment would have exposed her to the very real danger of additional violence. The State argues that Ms. Priddy was determined to retrieve her belongings, and the only way to separate her from Defendant was to remove her from the vicinity of the residence. The State contends that to ensure that Ms. Priddy would not return, it was necessary to retrieve her belongings.

**{35}**　Insofar as the State is attempting to argue that the FVPA creates a new exception to the warrant requirement, we are unconvinced. According to the FVPA, "[a] person who allegedly has been a victim of domestic abuse may request the assistance of a local law enforcement agency." Section 40-13-7(A). "A local law enforcement officer responding to the request for assistance shall be required to take whatever steps are reasonably necessary to protect the victim from further domestic abuse, including . . . upon the request of the victim, accompanying the victim to the victim's residence to obtain the victim's clothing and personal effects required for immediate needs and the clothing and personal effects of any children then in the care of the victim[.]" Section 40-13-7(B)(3). Despite the State's position that the officers in this case were allowed to enter Defendant's apartment without a warrant because of the duty to take reasonable steps to protect a domestic violence victim as articulated in the FVPA, the plain language of the FVPA does not authorize or even suggest that it can be used to justify a warrantless entry into a residence. The FVPA indicates that law enforcement may *accompany* a victim *to* the victim's residence. *Id.* The FVPA does not state that law enforcement officers have carte blanche to enter a private residence without a warrant.

**{36}**　As to the State's attempt to piggyback the FVPA onto the community caretaker exception, we again are unconvinced. In *Ryon*, our Supreme Court clarified the scope of the community caretaker exception in New Mexico. 2005-NMSC-005, ¶ 1. "The community caretaker exception recognizes that warrants, probable cause, and reasonable suspicion are not required when police are engaged in activities that are unrelated to crime-solving." *Id.* ¶ 24. The *Ryon* Court noted that there are actually three distinct doctrines that have emerged within the exception: the emergency aid doctrine, the automobile impoundment and inventory doctrine, and the community caretaking doctrine. *Id.* ¶ 25. "The emergency [aid] doctrine applies to . . . warrantless intrusions into personal residences[, while t]he . . . community caretaker . . . doctrine deals primarily with warrantless searches and seizures of automobiles[.]" *Id.* ¶ 26 (internal quotation marks and citations omitted). According to *Ryon*, "[s]ince the privacy expectation is strongest in the home[,] only a genuine emergency will justify entering and searching a home without a warrant and without consent[.]" *Id.*; *see Trudelle*, 2007-NMCA-066, ¶ 35 ("Our Supreme Court has stated that, when police conduct a warrantless search of a home in their community caretaking capacity, the search must be analyzed under the emergency assistance branch of the community caretaker exception."). "To justify the warrantless intrusion into a private residence under the emergency assistance doctrine, officers must have credible and specific information that a victim is very likely to be located at a particular place and in need of immediate aid to avoid great bodily harm or death." *Ryon*, 2005-NMSC-005, ¶ 42.

**{37}** In this case, the district court improperly relied on the general community caretaker doctrine that deals primarily with warrantless searches and seizures of automobiles. *See id.* ¶ 26. That the FVPA contemplates law enforcement assistance to protect a victim of domestic violence from further abuse when retrieving items from inside the victim's residence does not circumvent the requirement that only a genuine emergency will justify entering and searching a residence without a warrant and without consent. *See id.* In this case, there are no allegations and there is no evidence in the record of an emergency inside the residence that necessitated entry under the emergency aid doctrine. By all accounts, the officers did not enter Defendant's apartment to assist someone in need of immediate aid to avoid great bodily harm or death. Because *Ryon* holds that only a genuine emergency will justify entering and searching a home without a warrant and without consent and because there was no indication of an emergency inside the apartment justifying a warrantless entry, the community caretaker exception does not apply.

**CONCLUSION**

**{38}** For the foregoing reasons, the district court erroneously denied Defendant's motion to suppress, and the district court's order denying Defendant's motion to suppress is reversed. This matter is remanded for further proceedings consistent with this opinion.

**{39}** **IT IS SO ORDERED.**

 

 

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**JAMES J. WECHSLER, Judge**

_____
**J. MILES HANISEE, Judge**

13